# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-07-00626-CR
## NO. 03-07-00627-CR

**Laura Ashley Hall, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NOS. D-1-DC-05-301948 & D-1-DC-07-900170
### HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## O P I N I O N

We withdraw our opinion and judgment dated February 19, 2009, and substitute the following in its place. We overrule Hall's motion for rehearing and the State's "Supplemental Prayer for Relief on Appellant's Motion for Rehearing."

In *Pitonyak v. State*, 253 S.W.3d 834 (Tex. App.—Austin 2008, pet. ref'd), this Court affirmed the conviction of Colton Pitonyak, an intermittent University of Texas student, for the murder of twenty-one year-old Jennifer Cave, whose dismembered body was found in Pitonyak's West Campus-area condominium. Pitonyak was apprehended after fleeing to Mexico in the company of Laura Ashley Hall, a fellow UT student. This appeal arises from subsequent criminal proceedings against Hall.

Following a jury trial, Hall was convicted of the felony offense of tampering with physical evidence—namely, a human body or body part—and the misdemeanor offense of hindering apprehension. *See* Tex. Penal Code Ann. § 37.09(c), (d)(1) (West 2003),[1] § 38.05(a), (c) (West Supp. 2008).[2] Punishment was assessed at five years' imprisonment for the evidence-tampering offense and one year's imprisonment for hindering apprehension. Hall appeals, bringing seven points of error.

In her first two points, Hall seeks a new trial based on the State's advocacy of what she contends were inconsistent factual theories during her trial and Pitonyak's trial. Her third and fourth points raise claims of charge error. In her fifth and sixth points, Hall seeks a new trial based on allegations that the State suppressed or withheld evidence in violation of a discovery order and the Due Process Clause of the Fifth and Fourteenth Amendments, as construed in *Brady v. Maryland*[3] and its progeny. In her seventh point, Hall seeks, in the alternative, a new punishment trial based on an additional claimed *Brady* violation.

We agree with Hall that the State suppressed evidence in violation of a discovery order and *Brady*. While we conclude that these actions ultimately did not cause reversible error in Hall's convictions, they do require a new trial on her punishment.

---

[1] *See* Act of May 28, 1997, 75th Leg., R.S., ch. 1284, § 1, 1997 Tex. Gen. Laws 4907 (amended 2007) (current version at Tex. Penal Code Ann. § 37.09(c), (d)(1) (West Supp. 2008)). For convenience, we cite to the version of section 37.09 applicable to Hall's alleged acts by using the "(West 2003)" designation.

[2] Because there have been no intervening substantive changes to penal code section 38.05 since the time of Hall's alleged acts, we cite to the current version for convenience.

[3] 373 U.S. 83 (1963).

## BACKGROUND

Although Hall does not challenge the sufficiency of the evidence supporting her convictions, several of her appellate points must be evaluated in the context of the evidence presented at trial. We accordingly review the evidence in some detail.

**Jennifer Cave's disappearance, death, and discovery**

When last seen alive, Jennifer Cave was with Colton Pitonyak in Austin's Sixth Street district during the late evening hours of Tuesday, August 16, 2005. On this particular evening, the pair was celebrating a new job that Cave had obtained with an Austin law firm, which she was to start the following day. By all accounts, Cave was very excited about her new professional opportunity. A friend of Cave, Michael Rodriguez, testified at trial that he spoke with Cave via cell phone several times that evening, the latest at 1:05 a.m. on Wednesday, August 17. During that final conversation, according to Rodriguez, Cave indicated that she was still with Pitonyak, who was beating on car windows and urinating in public.

At approximately 3:00 a.m. that morning, according to witness Nora Sullivan—a former UT student whose connections to the underlying events included being a "good friend" of Pitonyak and down-the-hall neighbor in his condominium complex—Pitonyak showed up at her door alone indicating that he had misplaced his cell phone and asking to borrow hers. Sullivan recounted that Pitonyak, who appeared to her to be intoxicated, claimed to have exchanged gunfire at his condo with "two or three Mexican guys." Sullivan testified that Pitonyak remained at her condo for approximately half an hour while the two visited and smoked cigarettes on her balcony. During their visit, Sullivan ascertained that Pitonyak had a handgun in his possession, which

he unloaded in her presence. She added that Pitonyak also asked her if she noticed any blood on him. She noted a "smudge" of blood on Pitonyak's arm. Despite her observations and Pitonyak's statements, Sullivan did not contact police. She told the jury that she had simply dismissed Pitonyak's tale of a gunfight as false because she had not heard any shots.

That afternoon, Pitonyak purchased several items from Breed & Company, a hardware store located about four blocks from his condo: bathroom tissue, shop towels (described as a type of heavy-grade paper towel), 55-gallon drum liners, carpet cleaner, a quart of ammonia, Febreze odor eliminator, a two-pack of latex gloves, a small plastic-handled hack saw, and dust masks. These items, as well as a corresponding receipt, were later recovered from Pitonyak's condo. The receipt indicated that the purchases were made on August 17 at 3:18 p.m.[4] Jeffrey Breed, an owner of the hardware store, testified that he assisted a young man that afternoon in purchasing these items from what appeared to be a handwritten list. According to Breed, the young man was alone. Another receipt later recovered from Pitonyak's condo reflected a purchase from a nearby Burger King at 3:26 p.m.

In the meantime, Jennifer Cave had not shown up for work at her new job. The law firm attempted unsuccessfully to reach her by phone, and eventually sent someone to look for her at her apartment. Again having no success in finding her, the firm called Sharon Cave, Jennifer Cave's mother, expressing concern. Sharon[5] testified that after receiving the call, she

---

[4] The receipt itself stated only that the purchases had been made at "3:18" on August 17. Jeffrey Breed, an owner of the store, confirmed that the store would have been open only at 3:18 p.m.

[5] Both Sharon Cave and Loren Hall, Hall's father, testified at trial. We will use the first names of the parents and their children when necessary to avoid confusion with their common surnames.

made several calls to Jennifer's cell phone but did not get an answer. Sharon proceeded to contact Jennifer's cell phone provider, obtained a list of her daughter's incoming and outgoing calls the preceding evening, and began calling those numbers in an effort to locate her daughter.

Through her calls, Sharon was able to determine that Jennifer had been out with Pitonyak the preceding evening. Pitonyak's number had also appeared among Jennifer's incoming or outgoing calls, and Sharon attempted unsuccessfully to reach him. Pitonyak later returned her call.[6] Pitonyak, according to Sharon, acknowledged that he had been with Jennifer the preceding evening but claimed they had parted ways around midnight. At the same time, Sharon happened to be on a different phone line with Michael Rodriguez, the friend who had spoken with Jennifer by phone at 1:05 a.m. Rodriguez overheard Pitonyak's statements and informed Sharon that Pitonyak was lying because Jennifer had indicated during their later call that she was still with Pitonyak. Sharon confronted Pitonyak with that assertion. Pitonyak, according to Sharon, "just got mad and hung up."

Around 6:30 p.m., Scott Engle, a former boyfriend of Jennifer, called Pitonyak. Engle testified that "I had previously called him [Pitonyak] trying to find Jennifer as well and left him a message and told him that I believed the cops were on their way to his house because we knew Jennifer's car was over there." Engle added that Pitonyak's demeanor during this call was "[t]alking fast, jittery, nervous."

---

[6] Pitonyak's cell phone records were in evidence. They reflect a four-minute call to a number in Corpus Christi at 5:39 p.m., which corresponds roughly to the time frame Sharon described. The records also show a two-minute call at 5:47 p.m. to a Corpus Christi number that corresponds to Jennifer's cell phone number.

Sharon further testified that her fiancé, Jim Sedwick, was assisting her search efforts and had left a message that evening for Pitonyak to call him. Pitonyak called back, and Sharon answered.[7] She confronted Pitonyak, "Colton, I know that you were with Jennifer. I want to know where she is." Pitonyak, according to Sharon, responded, "Dude, I'm eating pizza with my friends. Leave me alone." Thereafter, Sharon contacted Austin police to report her daughter missing.

On the following morning, Thursday, August 18, 2005, Sharon, accompanied by Sedwick, drove from Corpus Christi to Austin, where they met another of Sharon's daughters and continued efforts to locate Jennifer. Sharon testified that while en route, Austin police contacted them and advised that Jennifer's car had been located at Pitonyak's condominium building. Concerned about Jennifer's safety and fearing that Pitonyak was somehow involved in her disappearance, Cave and Sedwick ultimately broke into Pitonyak's condominium. Sedwick entered the unit. He discovered Jennifer's body in the bathtub of the unit's bathroom. Sedwick immediately left the condo and called the police.

Sedwick and Austin police found a gruesome scene in Pitonyak's bathroom. Jennifer Cave's head and hands had been severed and placed in plastic garbage bags found on the bathroom floor. A plastic-handled hacksaw—one of the items Pitonyak had purchased at the hardware store the preceding afternoon—was found laying on top of Cave's headless torso. There were blood stains in the bathroom sink and on the carpeted floor of the condo's living area.

---

[7] Pitonyak's phone records reflect an 8:30 p.m. call to a number in the Corpus Christi area code.

Police also found two bullet or shell casings on a table in the condo's living room. An additional shell casing was found in the bathtub with Cave's body. On the living room table was also found a folding buck knife and one of the blue shop towels. Each of these items, as well as the hacksaw, later tested positive for blood. A dishwashing machine in the unit's kitchen area contained a machete and a steak knife. Also found in the unit were the other hardware items, an "Ace Hardware" bag, and the hardware store receipt, previously described. A pair of women's flip flops was also found on the bathroom floor near the bathtub and toilet.

Medical examiner Elizabeth Peacock performed an autopsy on Cave's body and testified on its results at trial.[8] She determined that Cave had been killed by a gunshot that had passed through Cave's right arm into her chest, severing her aorta, before the bullet lodged near her back. Peacock could not determine an exact time of death, but opined that unconsciousness and death would have followed quickly after Cave had been shot. Based on the absence of gunpowder residue on Cave's body, Peacock determined that the fatal shot had been fired from at least eighteen inches away.

On Cave's left hand was a stab wound that, according to Peacock, occurred at or shortly after the time of death. Peacock acknowledged that the wound might have been defensive in nature. There were also clusters of stab wounds in Cave's upper right chest and on the right side of her face and neck. The stab wounds were determined to have been made by the same knife and were described as symmetrical and in line, although some intersected into "Vs." Peacock opined that the stab wounds, as well as the severing cuts to Cave's head and hands, were made between four and

---

[8] Photographs of the body parts were also in evidence.

twenty-four hours after death. The severing cuts, according to Peacock, would have been "difficult" to make, especially the cut through the spine. During the autopsy, Peacock also discovered a bullet inside Cave's skull. She determined that the bullet had been fired into the head post-mortem through Cave's severed neck.

Pitonyak's car was found outside the condominium building. Inside it was a semi-automatic handgun. Forensics tests determined that the two bullets found inside Cave's body and the three shell casings found in the condo were fired from this gun.

A warrant subsequently issued for Pitonyak's arrest for murder. With the assistance of Mexican authorities, Pitonyak was eventually located in a hotel room in Piedras Negras. He was in the company of appellant Hall. Mexican authorities expelled the pair from the country at the Del Rio border crossing on August 23, 2005, where Pitonyak was promptly arrested by U.S. authorities. He was later indicted for murder, convicted, and sentenced to a fifty-five-year prison term. As noted, this Court affirmed his conviction on appeal. *See Pitonyak*, 253 S.W.3d at 844-57.

**Criminal proceedings against Hall**

On September 20, 2005, Hall was indicted on a felony count of hindering apprehension or prosecution. *See* Tex. Penal Code Ann. § 38.05. Section 38.05 of the penal code provides, in relevant part, that a person commits an offense "if, with intent to hinder the arrest, prosecution, conviction, or punishment of another for an offense . . . he: (1) harbors or conceals the other; [or] (2) provides or aids in providing the other with any means of avoiding arrest or effecting escape." *See id*. § 38.05(a)(1), (2). The offense is a Class A misdemeanor unless "the

8

person who is harbored, concealed, [or] provided with a means of avoiding arrest or effecting escape . . . is under arrest for, charged with, or convicted of a felony . . . and the person charged under this section knew that the person they harbored, concealed, [or] provided with a means of avoiding arrest or effecting escape . . . is under arrest for, charged with, or convicted of a felony," in which case the offense is a third-degree felony. *See id*. § 38.05(c), (d). Hall's indictment for this offense alleged in two separate paragraphs that Hall "on or about August 19, 2005, in the County of Travis, and State of Texas, did then and there, with intent to hinder the arrest, prosecution, conviction or punishment of Colton Pitonyak for the offense of murder," and while knowing "that the said Colton Pitonyak was charged with a felony, namely, Intentional Murder," (1) "harbor or conceal Colton Pitonyak" and (2) "provide or aid Colton Pitonyak with means of avoiding arrest of effecting escape, to-wit: the Defendant assisted Colton Pitonyak in his flight from the State of Texas and provided transportation for Colton Pitonyak in his flight from the State of Texas."

On June 7, 2007, after Pitonyak was convicted of murder, Hall was indicted on a second-degree felony count of tampering with physical evidence. *See id*. § 37.09 (West 2003). Under the version of section 37.09 applicable to this case, a person committed an offense if the person, "knowing that an offense has been committed, alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation of or official proceeding related to the offense." *Id*. § 37.09(d)(1) (West 2003). The offense was a third-degree felony. *Id*. § 37.09(c) (West 2003). Hall's indictment for this offense alleged that Hall, "on or about August 17, 2005"—the date Cave was discovered missing and Pitonyak made his hardware store purchases—and "in the County of Travis, and

9

State of Texas, did then and there, knowing that an offense, to wit: a murder, had been committed, alter or destroy or conceal a thing, to wit: a human body and biological evidence, with intent to impair its verity or availability as evidence in any subsequent investigation of or official proceeding related to the offense."

The two charges against Hall were consolidated for trial. Neither Hall nor Pitonyak testified at her trial.

### *Hall's participation in the Mexico trip*

The evidence implicating Hall in the charged offenses included the undisputed facts that during the evening of August 17, 2005—after Pitonyak learned that authorities might be suspecting him of being involved in Jennifer Cave's disappearance—Hall and Pitonyak left Austin and drove to Mexico in Hall's car. Hall and Pitonyak's cell phone records tracked the pair's path south through New Braunfels during the 10 o'clock hour, then westward along U.S. 90 to Del Rio and the Mexican border. Along the way, Hall received a speeding ticket in Val Verde County, an indication that she was driving. The pair crossed the border into Mexico at 2:36 a.m. on the morning of August 18. Surveillance photographs from the border checkpoint shows the license plates on Hall's Cadillac, and the car was later recovered by authorities when the pair was apprehended in Mexico. There was no evidence that Hall sought assistance from the authorities she encountered on her way to Mexico with Pitonyak.

The jury also heard evidence that Hall made preparations for the trip earlier in the day. A receipt recovered from Hall's Cadillac reflected a 3:47 p.m. purchase of approximately 19 gallons of gasoline and a car wash from a station located on East Oltorf in southeast Austin. This purchase

occurred at roughly the same time as Pitonyak's purchases from the hardware store and Burger King several miles away near the UT campus. The State conceded during closing argument that there was "no doubt" Pitonyak and Hall "were not together the entire day," but urged that Hall's gassing up and washing her car a few hours before leaving town was probative of a common plan with Pitonyak that included their respective "errands." Later that evening, but before the pair left Austin, Hall, accompanied by Pitonyak, stopped off at the apartment of some friends and picked up a bottle of rum or vodka she had previously left there. One of the roommates, Star Salzman, testified that Hall appeared "normal" and not in fear in any way.

### *Hall's presence at the crime scene*

The State also presented evidence of contemporaneous eyewitness perceptions, physical evidence, and phone records tending to show that Hall had been to Pitonyak's condo on August 17 before the pair left for Mexico. Cell phone records reflected a series of text and phone communications between Hall and Pitonyak beginning in the early morning hours of August 17.[9] At the time, Hall had been staying overnight at the apartment of Star Salzman and his roommates (the apartment to which she later returned to pick up her liquor on her way out of town). Another

---

[9] Hall's cell phone records reflected that Pitonyak sent her a text message at 3:34 a.m. (which, according to Nora Sullivan's account, would have been shortly after Pitonyak left her condo) and that Hall texted back at 3:35 a.m. There was testimony that Hall's return message stated, "What do you mean." Pitonyak's cell phone records, in contrast, showed the earliest text message he sent to Hall on August 17 was at 5:34 a.m. and did not reflect a responsive text message from Hall. Thereafter, both Hall and Pitonyak's cell phone records reflect a thirteen-minute call from Pitonyak to Hall beginning at approximately 6:00 a.m., a one-minute call from Hall to Pitonyak beginning at 6:57 a.m., a four-minute call from Pitonyak to Hall beginning at approximately 6:57, and a two-minute call from Pitonyak to Hall beginning at about 7:24 a.m.

of the roommates, Ryan Martindill, testified that Hall woke him at around 7:00 a.m. and asked him to drive her to her apartment so she could pick up her car. He did. According to Martindill, he understood that Hall was going to meet with Pitonyak and that "I think she said he was going to be leaving soon and she wanted to go spend some time with him."

The jury heard testimony about DNA testing performed on numerous items and sites at the crime scene, including the hacksaw, machete, buck knife, bloodstains in the living room and bathroom, various cloths or towels, and two dust masks found in the bathroom. Hall was statistically excluded as a contributor of DNA found on every item and site except for a blue shop towel found on a living room table—one of the items Pitonyak had purchased from the hardware store during the afternoon of August 17—and one of the women's flip-flops found in the bathroom. Neither Pitonyak nor Hall could be excluded as contributors of DNA found on the shop towel, and the probability of Hall being excluded as a contributor was 1:43. As for the DNA found on the flip-flop, neither Pitonyak, Hall or Cave could be excluded as contributors, and the probability of Hall being excluded as a contributor was 1:402.

DNA testing was also performed on the handgun recovered from Pitonyak's car. Neither Pitonyak nor Hall could be excluded as contributors of DNA found on the pistol's grip, slide, or magazine. The probability of Hall being excluded as a contributor of DNA found on the grip was 1:1,112 and, for the slide and magazine, 1:88.

The State's DNA expert, Cassie Carridine, acknowledged that Hall's probabilities of exclusion fell below the astronomical levels that would have constituted a conclusive "match." By comparison, Carridine explained that Hall was determined conclusively to be the contributor

12

of DNA found on women's underwear and a pair of sweat pants recovered from her car; her possibility of exclusion for each of these items was 1:18.71 quadrillion. As another example, Cave was determined conclusively to be the contributor of DNA found on the hacksaw—her probability of exclusion was 1:130.1 quadrillion—and Pitonyak and Hall were excluded as possible contributors.[10]  Carridine also acknowledged that DNA testing could not necessarily determine when a contributor had contact with a tested item or whether the item had been moved.  During its subsequent deliberations, the jury asked for Cassidine's testimony "in relation to the blue shop rags, the sandals from the bath room and the gun grip and magazine" to be read back to them.

The jury also heard evidence tending to establish that anyone who had been in Pitonyak's condo during the day on August 17 would have known about Cave's shooting and death. Police investigators described Pitonyak's condo as a one-bedroom efficiency, with a living and sleeping area, kitchen area, and single bathroom.  The jury could reasonably have inferred that in this small area, Hall could not have missed such telltale signs as shell casings and a blood stain in the living room—much less overlooked a dead body in the bathtub if she had entered the bathroom.[11]

### Hall's motive

The State also presented evidence that Hall was highly motivated to protect Pitonyak or otherwise seek his favor without regard to his involvement in a grisly crime and even if it meant

---

[10]  Carridine, however, suggested that any DNA from anyone who had merely touched the saw could have been "overpowered" by Cave's blood.

[11]  Moreover, Sedwick testified that when he entered the condo on the following morning, there was a strong odor coming from the bathroom.  However, there was no testimony regarding the extent to which this indicator would also have been present on the 17th.

breaking the law. It was undisputed that Hall had a very strong and somewhat obsessive romantic interest in Pitonyak, while it appeared that Pitonyak was somewhat less interested.[12] Joseph Smith, a deputy U.S. marshal present when Pitonyak was arrested at the border, testified that Hall "made statements regarding her love for Colton, that she wanted to get him out of jail, that she wanted to make a phone call to talk to his attorney to get him out of jail, that she wanted to stand by him no matter what happened, and things to that effect." Smith added that, "if someone had injured Colton, I believe she said that she would kill anyone who hurt Colton." He added that Hall expressed the view "that it should be up to the friends of a murder victim to avenge them and it should not be a police matter." Two days later, Hall returned to Austin, where she spent some time with Salzman and Martindill. Despite the murder charges pending against Pitonyak and what the record reflects was knowledge among her friends regarding the widely publicized macabre scene in his condo, Hall obtained a new tattoo of the name "Colton."

Hall and the State advanced competing theories during trial to explain her interest in Pitonyak. Hall's counsel attempted to portray her essentially as the manipulated victim of a "sociopath," who, at most, had exhibited bad youthful judgment in falling sway to the wrong kind of guy. The State portrayed Hall as a more menacing figure. There was evidence that Hall—like other friends of Pitonyak, including Cave—was aware that Pitonyak dealt drugs, was somewhat unstable, brandished guns or knives, and cultivated a gangster or "bad guy" persona. The State

---

[12] There was also testimony that, much to Hall's consternation, Pitonyak had other female friends that included Cave and Sullivan. Despite Hall's reservations, there was no direct testimony that Pitonyak was romantically linked with either Cave or Sullivan at the time of the crime, although there was evidence in the record indicating they had drug use in common.

presented evidence to the effect that Hall reveled in the role of the gangster's girlfriend and shared Pitonyak's dark traits. It was able to introduce a printout of Hall's Facebook page—last updated on August 15, 2005—reflecting, among other things, that Hall's "Summer Plans" included "I should really be more of a horrific person. Its in the works."[13]

### *Hall's self-incriminating admissions*

To fill in the remaining gaps in its theory that Hall not only helped Pitonyak flee the country to avoid a murder charge, but helped dismember Cave's body with intent to impede its use as evidence, the State relied on the testimony of four witnesses—Said Aziz, Henriette Langenbach, Nora Sullivan, and Javier Rosalez. Each of these witnesses recounted alleged self-incriminating admissions by Hall during the months before trial.[14]

---

[13] Hall listed her screen name as "DocPhantasm" and her favorite quote as the following statement from horror writer Peter Straub:

> You're part music and part blood, part thinker and part killer. And if you can find all of that within you and control it, then you deserve to be set apart.

Hall also listed, among her favorite films, several that had violent crime themes: Pulp Fiction, Scarface, Carlito's Way, Heat, and Donnie Brasco. At least two of the films, the State pointed out, had scenes involving the dismemberment of bodies.

Elsewhere on the page, under "About Me," Hall commented, "Uh, don't be like me. Not a role model! Also, I'm really quite bored. Entertain me?" Under "Clubs and Jobs," she similarly opined that "I hate my job. Working is for losers." Under "Looking For," Hall indicated, "Whatever I can get."

[14] Ryan Martindill, on the other hand, recounted that during Hall's visit on August 24, she claimed that "she was innocent," that "she did not know what was going on" at Pitonyak's condo, and that she had denied ever entering the condo's bathroom.

15

*Said Aziz*

Aziz testified that he had been a friend of Hall, Cave and Pitonyak while a student at UT. He recounted that Hall had called him seeking advice during the early morning hours of August 23, 2005, a few hours after she and Pitonyak were expelled from Mexico. Aziz ultimately spoke with Hall three times that day. During their first conversation, at approximately 6:30 a.m., Hall, according to Aziz, described the Mexican police kicking in the door to the hotel room where she was staying with Pitonyak and taking him away, adding, "I can't believe they found us so fast." Aziz, who had previously heard that authorities had been looking for Pitonyak in connection with a murder, asked Hall how long she had been involved in the situation. Hall, Aziz claimed, replied, "I have been all up in this shit since two hours after it started."

Hall, according to Aziz, indicated she would tell the police that she "just thought they were on vacation." Aziz responded "that my advice would be to start talking to police and tell the truth in order to stay out of trouble." He concluded their first call by telling Hall that he was going back to sleep and would call her again later. They next spoke around 11:30 a.m. According to Aziz, "Laura said that she wanted to protect Colton and help him. . . . I do recall specifically that I became more agitated and I angrily told Laura that I could understand it being accidental if Colton had just shot Jennifer one time. I couldn't believe that it was accidental with him stabbing her repeatedly and the other stuff." Aziz asked Hall how the pair got to Mexico. Hall replied that she drove, adding that they went in her own car. Aziz then "asked Laura why she would want to help somebody who killed a girl very much like herself, to which she replied that she loves him, and, quote, 'that's just how she rolls.'"

16

Hall, according to Aziz, also said she was not going to turn her back on Pitonyak, to which Aziz exclaimed that "I thought she was crazy and I was revolted by this crime." He also indicated that "She refused to believe that people would help the police. I don't understand necessarily why."

Aziz contacted the Austin Police Department and agreed to give a statement. At 3:35 p.m., as Aziz was in the parking lot by police headquarters preparing to go inside, he spoke to Hall again. Aziz described Hall as confused and distraught. She told him that the police were at her parents' house investigating her involvement in the matter. Hall, according to Aziz, now claimed that "she didn't know what was happening until the Mexican police came in."[15] Aziz "asked her to clarify" in light of the inconsistency with her prior statements, and asked her point-blank if she was lying then or had lied in her previous statements. Hall, Aziz indicated, stated that she had lied in first statement. He continued, "I asked her if she had just been blustering to appear tough and hard. She replied that she guessed so."

*Henriette Langenbach*

After she was charged with hindering apprehension, Hall was held for a period of time in the Travis County Jail. She shared a cell with Henriette (also known as Erika) Langenbach, who was being held on two felony counts of securing the execution of a document by deception and a felony count of misappropriating property by a fiduciary. At the time of trial, Langenbach was

---

[15] It was on the following day that Hall professed to Martindill her innocence and ignorance of Pitonyak's crime.

17

on probation for these offenses. She provided by far the most detailed account implicating Hall in the charged offenses.

Langenbach, who was in her early sixties, claimed that she developed a "motherly relationship" with Hall during their time together and that they had extensive conversations about Pitonyak and the Cave matter. Langenbach claimed that Hall professed that "she loved [Pitonyak] very much." She added that Hall seemed to perceive the murder victim, Cave, as a romantic rival, appeared to be "extremely jealous" of Cave, and would typically refer to Cave as "f*cking waitress ho."

Langenbach provided the jury essentially a step-by-step narrative of events in Pitonyak's condo during the hours before Hall and Pitonyak left for Mexico. According to Langenbach, Hall "told me that when Colton called her at 5:30 in the morning, and when she arrived there, that he took her to the bathroom and showed her the body." Langenbach claimed Hall told her that Pitonyak admitted shooting Cave and stabbing her body to make sure she was dead. After viewing the body in the bathtub, Hall then supposedly recounted that she and Pitonyak "first sat on the couch and talked about things." Later, Hall purportedly told Langenbach, she used the bathroom toilet—in the same bathroom where Cave's body lay—after Pitonyak closed the shower curtain to conceal the body in the bathtub.

Hall, according to Langenbach, described Pitonyak's demeanor at the time as drunk, drugged, "just beside himself," "worth nothing," and "freaking out." Hall supposedly claimed that Pitonyak initially wanted to flee to Detroit or his parent's house, but that she had convinced him this plan was foolish because he would get caught. Hall also allegedly revealed that "it was their

18

plan to dispose of the hands, the feet and her head and put it in Colton's car and drive it to a lake somewhere and dispose of the car that way with the body parts in it." When asked if Hall indicated whose idea it was to dismember Cave's body, Langenbach testified that Hall "gave me the impression that she was in charge of this operation" by portraying herself as "the one with the cool head," while "all [Pitonyak] did was either scream or cry or swear." Hall also supposedly boasted that Pitonyak had originally sought her out for help precisely because of her cool-headed character.

Hall, Langenbach continued, claimed that she "told Colton to get the stuff he was supposed to get" and made him a list. The pair then separated to run errands. Hall went to the bank and to get gas, cigarettes, and something to eat and drink. Langenbach testified that she asked Hall, with apparent reference to Breed & Company, why Pitonyak went "to a small place like that" rather than "Home Depot." Hall allegedly remarked that "the sweetheart, he's extremely intelligent, but when it comes down to this, he just doesn't know."

According to Langenbach, Hall told her she rejoined Pitonyak at a pizza restaurant. While Pitonyak was eating, Hall purportedly recounted, he received a call from Sharon Cave, "freaked out," and "basically rushed through lunch." The pair went back to Pitonyak's condo "because they had made the decision already to go to Mexico then and they needed stuff from the apartment." Hall allegedly "told me that she was the one that made the decision to go to Mexico because . . . she speaks fluent Spanish." While gathering belongings, Hall, according to Langenbach, observed that Cave's head and hands had been placed in black and white plastic bags, a description consistent with the evidence from the crime scene. The pair then drove to Mexico. Langenbach claimed that Hall described her time with Pitonyak in Mexico as "the six happiest days of her life."

19

Langenbach further testified that Hall told her the pair sought out a hotel with an Internet connection "to stay on top of things because they were worried that they had found the body in the meantime and that they would be looking for Colton." Hall purportedly also indicated that they had planned to sell her car to get money to travel to Switzerland or Brazil, but ran into the obstacle that Hall had not brought the car's title. Hall also allegedly admitted to Langenbach that she and Pitonyak discussed different versions of the "story that they would have for the police."

Langenbach also testified that Hall described details about the dismemberment, including where Cave's hands were severed, and further observed, "if you cut up a dead body, there wouldn't be that much blood" because blood would no longer be circulating. She also accused Hall of bragging, "How many grandmothers can tell their grandchildren that they cut up a body?"

Langenbach described Hall's demeanor regarding the horror of these acts "as just very cold, very unfeeling." She added that Hall attributed her ability to run errands, eat, and perform other everyday tasks under these circumstances to Hall's opinion that "intelligent people are able to compartmentalize things." Langenbach further testified that Hall claimed she "didn't understand what the big fuss was about" because, as Hall supposedly put it, Cave "was nothing. She was nobody. Colton had a full paid scholarship and Jennifer was just a waitress."

*Nora Sullivan*

Sullivan was the friend of Pitonyak whom he had visited at approximately 3:00 a.m. on August 17. After giving her account of Pitonyak's visit, which we have previously summarized, Sullivan testified that she had visited Pitonyak in the Travis County Jail between five and ten times, and that Hall had accompanied her on one of those visits in the spring of 2006. Over vigorous

20

objections from Hall's counsel, Sullivan was permitted to testify that Hall had made several key admissions following the jail visit. The basis of Hall's objection was that the State had violated a discovery order by failing to disclose Hall's alleged self-incriminating statements prior to trial.

Hall, according to Sullivan, acknowledged that she had been in Pitonyak's apartment after Cave's death and that Pitonyak had been engaged in "his task" of dismembering Cave's body. Sullivan further claimed that Hall "said that he [Pitonyak] was procrastinating and sitting in the living room and watching TV and drinking beer" and that she had "tried to motivate" Pitonyak "to get him to do it . . . to convince him and get him moving." When asked if Hall had indicated whether she played any direct role in the mutilation or dismemberment or Cave's body, Sullivan testified, "She didn't outright say so, but that was the impression I was given."

*Javier Rosalez*

During the summer of 2006, Hall was working as a server at the Baby Acapulco restaurant on Austin's Barton Springs Road. One of Hall's co-workers was Javier Rosalez, who acknowledged having prior felony convictions for drugs and DUI for which he had served prison time. Rosalez testified that restaurant staff had heard the "buzz" about the Cave death and dismemberment and became aware that the co-worker they knew as "Ashley"—Laura *Ashley* Hall—had been implicated in some manner. Rosalez probed Hall about it. He claimed that Hall was initially reluctant to discuss the matter, citing an ongoing investigation, but eventually opened up to him and "almost seemed kind of boasting at times." Hall, according to Rosalez, "said she had—she had helped and then masterminded the escape to Mexico." However, Rosalez testified that Hall did

21

not further elaborate on the extent or nature of her "help." He also denied that Hall had claimed to be the "mastermind" of Cave's dismemberment.

Rosalez added that Hall claimed "they would have gotten away with it" if she had not called her father from Mexico, which had prompted her father to turn them in. Rosalez also testified that he got into a heated argument with Hall after she once dismissed the incident as "a victimless crime" and opined that "they deserved to get away with it because they had already been locked up and they had learned their lessons."

On cross-examination, Rosalez admitted that he had gossiped to his co-workers about Hall's purported statements to him, but did not contact police. He acknowledged that he divulged these statements to police only after police, having eventually heard about Rosalez's statements to his co-workers, showed up at his house. At the time, Rosalez was still on parole. Hall's trial counsel urged the jury to infer that Rosalez, fearing adverse parole consequences, had spread false or greatly embellished rumors about Hall, then stuck by these stories after authorities confronted him. The State countered by suggesting that Rosalez had far more to fear from a perjury charge if his account of Hall's admissions proved to be false.

### *Verdict*

The district court submitted the felony charge of hindering apprehension or prosecution with the lesser-included offense of misdemeanor hindering apprehension or prosecution. *See* Tex. Penal Code Ann. § 38.05(a), (c), (d) (offense is a felony if the defendant "knew that the

22

person they harbored, concealed, [or] provided with a means of avoiding arrest or effecting escape . . . is under arrest for, charged with, or convicted of a felony," and is otherwise a misdemeanor). The jury found Hall not guilty of the felony offense but convicted her of the lesser-included misdemeanor.

The district court separately submitted the offense of tampering with physical evidence with a lesser-included offense of attempted tampering with physical evidence. *See id*. § 37.09(d)(1) (West 2003). It refused a timely request from Hall to submit a lesser-included offense charge on the offense of failure to report human remains. *See id*. § 37.09(d)(2) (West 2003). The jury found Hall guilty of tampering with physical evidence as charged in the indictment.

### *Punishment phase*

The issue of Hall's punishment was then tried to the jury. The State called a single additional witness, Douglas Conley. Conley testified that he was working as a taxi driver during the morning of August 6, 2006, when he picked up a woman, "Ashley," from a West Campus-area residence and drove her to the Baby Acapulco's on Barton Springs Road. In the courtroom, Conley identified the "Ashley" from his cab as Hall. The State elicited Conley's testimony that Hall had made disparaging comments about Cave and exhibited a demeanor toward the victim that he characterized as "just cold, callous."

Conley recounted that he and "Ashley" had a conversation in which she divulged that she was having trouble getting into law school because of a pending felony charge. Upon inquiry, "Ashley" told Conley that the charge was harboring a fugitive, further indicating that the fugitive was her boyfriend, that he was charged with murder, and that he was innocent. Conley

23

claimed that "Ashley" referred to the murder victim as "some bitch." According to Conley, "Ashley" elaborated that the victim had caused her "a lot of difficulty" and that the person was "Jennifer Cave."

Hall presented her father, Loren Hall. He testified that his daughter had a history of academic success; working for prominent Austin law firms and lawyers; and participating in wholesome activities like debate, swimming, and rowing. According to Loren, his daughter's personality and demeanor changed dramatically for the worse after she met Pitonyak. These changes, he claimed, included frequent use of derogatory terms for women. Loren added that after enduring her "trauma and things she was through with Colton," Hall had been taking medication to control her affect and moods, that she had improved, and that "she is trying to improve herself . . . building herself back up, having more respect for people." Loren pleaded with the jury to give his daughter probation, urging that she would work hard to rehabilitate herself if given the chance. He cited an example of Hall having worked hard to overcome difficulties and succeed in a college math course.

Hall also called Jason Mack, a former roommate of Pitonyak who also had known Hall and Cave. Mack testified that Pitonyak had borrowed money from Hall because he had needed to pay some "pretty bad characters." Mack recounted that Hall came to Pitonyak's condo two days before Cave's murder to discuss the money issue with him. At the time, according to Mack, Pitonyak was drinking, drugged, "spazing out" because his anxiety medication had run out, and "had been up about nine days." Mack claimed that Pitonyak physically threw Hall out of his condo. While Hall "was outside on the steps crying because [Pitonyak] had thrown her out," Pitonyak, Mack indicated, pulled a gun out of a drawer and stated, "This bitch is getting on my

24

f*cking nerves. I'm going to shoot her." Mack eventually calmed him down, but later warned Hall that "you are going to get yourself killed" and that Pitonyak "is not in his right mind," "hadn't slept in nine days," and "is getting delusional."

The jury imposed a sentence of five years' incarceration for the evidence-tampering conviction, the maximum one year for hindering apprehension, and did not recommend community supervision for either conviction.

### Post-judgment proceedings

Hall filed a motion for new trial or, alternatively, a new punishment trial. Of relevance to this appeal, Hall argued that the State had wilfully violated a discovery order by failing to disclose Hall's alleged statements to Nora Sullivan. She also asserted that the State had violated *Brady* by failing to disclose impeachment evidence against Henriette Langenbach and Douglas Conley that she had discovered after trial. Both sides presented affidavits and documentary evidence. After a hearing, the district court overruled Hall's motion in its entirety and subsequently entered findings of fact and conclusions of law. This appeal followed.

## ANALYSIS

### Inconsistent theories

Hall's first two points of error are predicated on her assertion that the State advocated a factual theory of her involvement in Cave's dismemberment during her trial that was inconsistent with its theory during the *Pitonyak* trial. Citing excerpts from the closing arguments at each trial, Hall argues that during the *Pitonyak* trial "the State argued that it was Pitonyak's idea to mutilate the

body and the evidence showed appellant did not participate," while "the theory and argument were exactly opposite" in her trial. In her first point of error, Hall argues that this claimed inconsistency violated her due process rights. *See Thompson v. Calderon*, 120 F.3d 1045, 1056-59 (9th Cir. 1997) (en banc), *rev'd on other grounds*, 523 U.S. 538 (1998); *see also Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000) (holding "that use of inherently factually contradictory theories violates the principles of due process."). In her second point of error, Hall similarly contends that the State should have been judicially estopped from advocating its "inconsistent" theory in her trial. *See Arroyo v. State*, 117 S.W.3d 795, 798 (Tex. Crim. App. 2003). The State disputes whether Hall preserved her due process complaint and asserts several reasons why it believes neither doctrine is implicated on the record here. We need only hold that there is no inconsistency between the State's theories at each trial that would implicate either due process or judicial estoppel.

During his trial, Pitonyak attempted to refute the mens rea element of murder by claiming that he had no recollection of shooting Cave and that he would not have harmed her intentionally. As for what Cave's subsequent dismemberment and his flight might imply about his awareness of guilt, Pitonyak attempted to shift the blame for those acts to Hall. He denied any personal recollection of cutting the body himself and claimed that, after purchasing the hardware items, "I tried to go in there and do some cutting, but couldn't." During closing argument, the State attacked Pitonyak's claims by emphasizing the relative amounts of DNA evidence linking Pitonyak to the dismemberment as compared to Hall:

> That mutilation shows you, that flight to Mexico shows you, he had a guilty conscience. He knew what he had done, he knew he shouldn't have done it, and he was going to get out of there.

26

They again want to blame [Laura Hall[16]] for all of that. That's all her doing. But, ladies and gentlemen, the evidence doesn't support that. . . . That mutilation and trip to Mexico was Colton Pitonyak's idea. And I will tell you why I know that. Look at the DNA. The only five places in this case [where] you see DNA of Laura Hall are two items of female clothing in a backpack that came back from Mexico, on a blue shop towel on the coffee table in front of the couch, on that handgun and on a sandal by the toilet in the bathroom. Those are the only five places. And these two men want you to believe that this one hundred whatever pound girl mutilating a body for hours, causing all sorts of injuries, doing what Dr. Peacock [the medical examiner] described as all kinds of work, she managed to do it without leaving any DNA. She is an absolute genius. The evidence doesn't support that.

There is a green washcloth with his blood. There is a pair of jeans in the washer with his blood. There is a faucet knob with a combination of Jennifer and Colton. There is a smear on the wall, blood, and Colton. There is a smear in the bathtub, Jennifer and Colton. That same shop towel that had Laura Hall, Colton Pitonyak, and he, too, is on that gun. . . . You don't get injured, you don't bleed as a result of an accidental gunshot being fired. You get injured mutilating a body in a bathtub.

During Hall's trial, the State argued:

If you have any doubt that Jennifer Cave was altered, destroyed or concealed, (demonstrating), that is Jennifer Cave. And the manner in which she was found was altered, it was destroyed, it was concealed in bags. That's the offense.

You know Laura Hall was involved in that because of what she told people. . . . "All up in that" does not mean that you had no idea there was a body in that bathtub. She knew from two hours after he killed Jennifer Cave what they needed to do to avoid his conviction, his prosecution, his punishment and conviction. And that plan went into action with a 13-minute phone call at 6:00 a.m. on August 17th.

The next statement would be Henriette Langenbach. . . . There were two white bags, one for the hands, one for the head. She told you that Laura Hall told her that the feet, the hands and the head are used for identification purposes. . . .

---

[16] The record actually read, "Jennifer Cave (sic)." From context, the State obviously intended to refer to Hall rather than Cave.

The course of actions during the next day.  He . . .went to Breed's, I went to gas the car. . . .

The next statement she made was to Nora Sullivan after her release from jail . . . Nora told you what Laura said, is that she was the mastermind behind the tampering with the evidence[17]. . . . Nora told you she [Hall] was frustrated because Colton wouldn't do what Colton needed to do. . . . She acted with the intent to make sure that he didn't get arrested, convicted, punished for the offense of murder.  In doing so, she helped him get to Mexico, she helped get him out of Apartment 88 at 2529 Rio Grande.  She helped mutilate that body, and she did whatever she could to try to make sure those items were not available in any subsequent proceeding against Colton Pitonyak.  And yes, they failed to finish the job, but that does not get you to attempt.  Attempt is only if you find that she [Cave] was not altered or concealed or destroyed.

Hall characterizes the State's arguments before the *Pitonyak* jury as tantamount to an assertion that she was innocent of any involvement in Cave's dismemberment.  To the contrary, as the district court observed when rejecting this argument below, "[i]t looks like [the State] is saying that [Hall] alone could not have done that," not that Hall had not participated in the dismemberment to any extent.  The State's theory in the *Pitonyak* trial, in other words, was that Pitonyak must have been heavily involved in the dismemberment because Hall left relatively little DNA and this fact was inconsistent with the sort of struggle Hall would have had if she had acted alone in cutting through Cave's spine and hands.  This theory does not logically foreclose or contradict the State's theory during Hall's trial that "[s]he helped mutilate that body" in some manner and was culpable at least as a party.  At most, there may be some potential tension between the State's current depiction of Hall as the "mastermind" of the evidence-tampering scheme and its arguments before the *Pitonyak*

---

[17]  Actually, Sullivan didn't say this.  It was Rosalez who used the term "mastermind," but he denied that Hall ever claimed to have masterminded the evidence-tampering, as opposed to the flight to Mexico.  The facts asserted by the State most closely resemble Langenbach's testimony.

jury that the "mutilation and trip to Mexico was Colton Pitonyak's idea." However, these two views can be reconciled to the extent that Hall could have been the mastermind of a plan for accomplishing a dismemberment that Pitonyak had initially conceived.

To violate due process, an irreconcilable inconsistency must exist at the core of the State's cases. *See Groose*, 205 F.3d at 1050-52 (due process violated by contradictory theories in murder trials of co-defendants—in one case, that the victims had been killed before a defendant began to participate in a burglary, and in the other, that the victims had been killed after the defendant began to participate in the burglary). There was no such inconsistency here. We overrule Hall's first point of error.

We similarly conclude that judicial estoppel is not implicated here. Judicial estoppel prohibits a party who has taken a position in an earlier proceeding from subsequently taking a contrary position. *Davidson v. State*, 737 S.W.2d 942, 948 (Tex. App.—Amarillo 1987, pet. ref'd); *see Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 11-13 (Tex. 2008) ("The doctrine of judicial estoppel precludes a party from adopting a position inconsistent with one that it maintained successfully in an earlier proceeding.") (citations omitted). The doctrine is not, strictly speaking, estoppel, but rather "arises from positive rules of procedure based on justice and sound public policy." *Davidson*, 737 S.W.2d at 948. Its essential function is to prevent litigants from taking contradictory positions in successive proceedings. *Id*. Concluding that there is no inconsistency in the State's theories against which justice or sound public policy would require judicial estoppel's application here, we overrule Hall's second point of error.

29

**Charge error**

***Refusal to submit failure to report human remains***

The offense of tampering with physical evidence for which Hall was convicted was defined in section 37.09(d)(1) of the penal code. *See* Tex. Penal Code Ann. § 37.09(d)(1) (West 2003). Subsection (d)(2) of that statute defined a misdemeanor offense of failure to report human remains. *See id*. § 37.09(d)(2) (West 2003). In her third point of error, Hall argues that the district court abused its discretion in refusing her request to submit a lesser-included-offense charge on failure to report human remains with the court's charge on tampering with physical evidence.

We review the district court's decision regarding a lesser-included-offense charge for abuse of discretion. *See Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004). A trial court may instruct the jury on a lesser-included offense if (1) the offense in question is a lesser-included offense under article 37.09 of the Texas Code of Criminal Procedure, and (2) the record contains some evidence that would permit a rational jury to find the defendant guilty only of the lesser-included offense. *See Hall v. State*, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005). This two-pronged test is often referred to as the *Aguilar/Rousseau* test. *See id*. (citing *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985); *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993)).

An offense is a lesser-included offense if:

(1)     it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

30

(2)     it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3)     it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4)     it consists of an attempt to commit the offense charged or an otherwise included offense.

Tex. Code Crim. Proc. Ann. art. 37.09 (West 2006). Hall urges that the offense of failure to report human remains is a lesser-included offense because it is established by proof of the same or less than all the facts required to establish the commission of the charged offense of tampering with physical evidence. *See id*. art. 37.09(1).

The court of criminal appeals has explained that "the facts required to establish the commission of the charged offense" under this analysis refers to the facts as alleged in the charging instrument. *See Hall v. State*, 225 S.W.3d 524, 534-35 (Tex. Crim. App. 2007). Therefore, "the determination of whether a lesser-included offense is involved should be made by comparing the elements of the greater offense, as the State pled it in the indictment, with the elements of the statute that defines the lesser offense." *Peavey v. State*, 248 S.W.3d 455, 467 (Tex. App.—Austin 2008, pet. ref'd). This component of our analysis presents a question of law. *Hall*, 225 S.W.3d at 535.

Hall's indictment for tampering with physical evidence alleged, in relevant part:

that Laura Hall, on or about the 17th day of August, 2005, and before the presentment of this indictment, in the County of Travis, and State of Texas, did then and there, knowing that an offense, to wit: a murder, had been committed, alter or destroy or conceal a thing, to wit: a human body and biological evidence, with intent to impair

31

its verity or availability as evidence in any subsequent investigation of or official proceeding related to the offense.

As the offense was alleged in the indictment, the State was required to prove the following elements: (1) Hall; (2) knowing that a murder had been committed; (3) altered, destroyed, or concealed a human body; (4) with intent to impair its verity or availability as evidence in any subsequent investigation or official proceeding related to the offense. The statutory elements of the offense of failure to report human remains were: (1) a person, (2) "observes human remains under circumstances in which a reasonable person would believe that an offense had been committed," (3) "knows or reasonably should know that a law enforcement agency is not aware of the existence of or location of the remains," and (4) "fails to report the existence of and location of the remains to a law enforcement agency." Tex. Penal Code Ann. § 37.09(d)(2) (West 2003).

Hall argues that the indictment allegations that she knew a murder had been committed and intentionally concealed a human body contains the failure-to-report-human-remains statutory element of "observes human remains under circumstances in which a reasonable person would believe that an offense had been committed." Similarly, Hall contends that the indictment allegation that she "concealed" a human body contains the statutory element of "fails to report the existence of and location of the remains to a law enforcement agency." However, the State could prove each element of evidence-tampering as alleged in the indictment without needing to prove the statutory element that Hall "knows or reasonably should know that a law enforcement agency is not aware of the existence of or location of the remains." To the contrary, Hall could, knowing that a murder had been committed, alter, destroy or conceal a human body with intent

32

to impair its verity or availability as evidence even if she knew or reasonably should have known that law enforcement officers already were aware of the remains' existence and were on their way to the scene.

Consequently, the offense of failure to report human remains would not be established by proof of the same or less than all the facts required to establish the commission of the charged evidence-tampering offense. The first step of the *Aguilar/Rousseau* test is not met. We need not reach the second step. *See Peavey*, 248 S.W.3d at 468. We hold that the offense of failure to report human remains was not a lesser-included offense of tampering with physical evidence as alleged in the indictment. The district court did not abuse its discretion in refusing to submit a lesser-included offense charge on failure to report human remains. We overrule Hall's third point of error.

### *Failure to define "murder"*

Tracking the indictment, the jury charge on tampering with physical evidence required the State to prove, among other elements, that Hall acted "knowing that an offense, to wit: a murder had been committed." Under the penal code, a person commits "murder" if he:

(1)     intentionally or knowingly causes the death of an individual;

(2)     intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3)     commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

33

Tex. Penal Code Ann. § 19.02(b) (West 2003). The penal code further provides that "[a] person acts intentionally, or with intent, with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result." *Id.* § 6.03(a) (West 2003). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). Reading the jury charge together with the penal code's definition of "murder" would mean that the State was required to prove that Hall was aware at the time of her alleged acts that Pitonyak had shot Cave with the conscious objective or desire to kill her or cause her serious bodily injury, with awareness that his act was reasonably certain to kill her, or in the course of and in furtherance of his commission or attempted commission of a felony other than manslaughter. However, the jury charge did not include this definition of "murder" from the penal code, or any definition of the term.

In her fourth point of error, Hall argues that the district court reversibly erred in failing to include the penal code's definition of "murder" in the jury charge on evidence-tampering. She urges that without this definition, the jury could "apply their own personal definitions" and "was free to convict appellant even if they found the homicide was committed recklessly or with criminal negligence." *See id.* §§ 19.04 (manslaughter, or recklessly causing the death of an individual), 19.05 (criminally negligent homicide) (West 2003).

We review Hall's claim under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). Under the first prong of the test, we determine whether charge error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). The State concedes in its brief that "[s]ince the jury necessarily had to use the term 'murder' in

34

properly resolving the issues in this case," the district court erred in failing to supply the penal code's definition of the term. *See Arline v. State*, 721 S.W.2d 348, 352 n.4 (Tex. Crim. App. 1986) ("[A] statutorily defined word or phrase must be included in the charge as part of the 'law applicable to the case.'").[18] Because the State concedes that error exists, our disposition of Hall's complaint turns solely on the second prong of the *Almanza* test—whether the error caused "harm." *Ngo*, 175 S.W.3d at 743. The degree of harm required for reversal depends on whether Hall preserved her charge error complaint in the district court. If she preserved the complaint by timely objection, the record must show only "some harm" for reversal. *Almanza*, 686 S.W.2d at 171. By contrast, if Hall failed to preserve the complaint, the error would require reversal only if it resulted in "egregious harm." *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008). The State argues that Hall failed to preserve her complaint and that the error did not cause egregious harm.

Hall acknowledges that she never specifically objected to the district court's failure to define "murder" in the charge, but suggests that she "[a]rguably" called the error to the district court's attention when arguing a motion for instructed verdict on the evidence-tampering offense. Hall relies on the following statements by her trial counsel:

---

[18] In response to Hall's motion for rehearing, the State disavows its earlier concession and urges that the district court was not required to define "murder" in accordance with the penal code after all. Because the State has not only failed to raise this contention on original submission, but advocated a contrary position, we do not consider it. *See Rochelle v. State*, 791 S.W.2d 121, 124-25 (Tex. Crim. App. 1990); *see also Chang v. Nguyen*, 76 S.W.3d 635, 637-38 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("Because this contention was not only not raised in her original brief, but, if anything, is contrary to the challenge set forth in her brief, it is not a ground on which her motion for rehearing can be sustained.").

Your honor, I want my record to be complete. Both sides having closed as to the indictment on tampering, again, the defendant would request an instructed verdict as to this charge. Looking straight at the face of the indictments, it requires actual knowledge that an offense, a specific offense, murder, had been committed. Murder is a legally defined term of art. It is not synonymous with killing. It is not synonymous with death. Murder is a legally defined conclusion, and there is no evidence that Ms. Hall could have known a murder could have been committed. For that reason—and there is no proof, there is nothing in the record to show that she knew at any point that a murder had been committed . . . . Murder being a term of art defined by law, we believe that we are entitled to an instructed verdict on that as well.

We cannot agree that these statements preserved Hall's current complaint with the absence of a "murder" definition in the jury charge. To preserve a complaint of charge error, Hall was required to "distinctly specify each ground of objection" in a manner "specific and clear enough to apprise the trial court of the nature of the objection." *Pennington v. State*, 697 S.W.2d 387, 390 (Tex. Crim. App. 1985); *see also* Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007) (requiring that defendant "distinctly specify[] each ground of objection" to charge). In the "arguable" objection on which she relies, Hall never refers to the jury charge. Instead, she frames her arguments solely in terms of sufficiency of the evidence as it bore upon her entitlement to an instructed verdict. As the State observes, a motion for instructed verdict denotes a challenge to the sufficiency of the evidence rather than a challenge to the form of the jury charge. *See Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993). Hall's argument at trial regarding her instructed verdict motion was insufficiently specific and clear to apprise the district court of any additional complaint that the court needed to add a definition of "murder" to the charge. *See Pennington*, 697 S.W.2d at 390. Consequently, we will reverse only if we find the omission of the definition resulted in "egregious harm." *See Almanza*, 686 S.W.2d at 171.

36

"Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). Here, our concern is whether the absence of the penal code's definition of "murder" in the charge caused the jury to convict Hall of evidence-tampering without finding an element that the State was required to prove—that she knew Pitonyak had committed a *murder*, as that term is defined in the penal code, and not some less culpable form of criminal homicide. The purpose of the egregious-harm inquiry is to ascertain whether the defendant has incurred actual harm, not just theoretical harm. *Almanza*, 686 S.W.2d at 174. This is a "difficult standard." *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002). Our inquiry is factual in nature and turns on the unique circumstances of this case. *See id*. Neither Hall nor the State has the burden to show harm or the lack thereof. *See Warner*, 245 S.W.3d at 464. Rather, an appellate court "makes its own assessment" in evaluating what effect, if any, an error had on the jury's verdict by looking "only to the record before it." *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000). We are to consider (1) the entire jury charge, (2) the state of the evidence, including the contested issues and the weight of the probative evidence, (3) the parties' arguments, and (4) any other relevant information revealed by the record of the trial as a whole. *Allen*, 253 S.W.3d at 264; *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006). Harm may be shown by direct evidence or inferred from the record. *See Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

As Hall emphasizes, nothing in the charge itself required the jury to apply the penal code's definition of "murder" or otherwise distinguished "murder" from other forms of

criminal homicide. When a statutory term is not defined in the jury charge, we are to assume that the jury considered the commonly understood meaning of the term in its deliberations. *See Olveda v. State*, 650 S.W.2d 408, 409 (Tex. Crim. App. 1983). Citing a single dictionary definition, the State asserts that the commonly understood meaning of "murder" denotes killing another with premeditation or malice aforethought, elements not explicitly included in the penal code definition. *See Webster's New World Dictionary of the American Language* 936 (2d College ed. 1976) (murder is "the unlawful and malicious or premeditated killing of one human being by another; [or] any killing done while committing some other felony, as rape or robbery"). The State invokes the principle that where the commonly understood meaning of an undefined statutory term in a jury charge is more restrictive than the statutory definition, there is no harm from omitting the statutory definition from the charge because the omission would only operate to the defendant's benefit. *See Olveda*, 650 S.W.2d at 409.

We agree that the term "murder," as commonly understood by laypeople, can denote intentional homicide, if not also premeditation and malice, as suggested by numerous dictionaries we have consulted.[19] However, "murder" also has a broader or more colloquial meaning

---

[19] *See Merriam-Webster's Collegiate Dictionary* 764 (10th ed. 2000) ("The crime of unlawfully killing a person especially with malice aforethought."); *American Heritage Dictionary of the English Language* 863 (1973) ("The unlawful killing of one human by another, especially with premeditated malice."); *Cambridge Dictionary of the English Language*, available online at http://dictionary.cambridge.org/define.asp?key=murder*1+0&dict=A (last visited January 6, 2009) ("The crime of intentionally killing a person."); *Compact Oxford English Dictionary*, available online at http://www.askoxford.com/concise_oed/murder?view=uk (last visited January 6, 2009) ("The unlawful premeditated killing of one person by another.').

38

denoting homicide without legal justification—or, simply, homicide.[20] Depending on which of these "commonly understood" meanings jurors applied, "murder" might be broader or narrower than the penal code's definition. Because jurors could, all other things being equal, apply either meaning, we disagree with the State that *Olveda* resolves Hall's complaint.

The trial record, however, reflects that in their statements and arguments before the jury, both parties equated the term "murder" with intentionally causing death, a definition consistent with section 19.02(b)(1) of the penal code. In an effort to minimize her involvement, Hall advanced a primary theory that Pitonyak was "crazy," a "sociopath" or a "beast" who intentionally killed Cave, dismembered her body, and perhaps even killed her with that plan in mind. During opening statements, Hall's trial counsel informed the jury that "[t]he evidence is going to show that this was a deliberate and planned murder. There was nothing accidental about it. . . . [T]his murder was for no reason at all than to satisfy the whim and caprice of a beast who wanted to see what it would feel like to kill someone and take that body apart." During closing argument, Hall's counsel returned to this theme, arguing that Pitonyak "murdered [Cave] for nothing" and urging the jury to infer his intention to dismember her from evidence of his interest in crime movies with dismemberment scenes and that his last UT course was "The Human Body." Neither party argued to the jury

_____

[20] *See Random House Dictionary of the English Language* 1266 (2nd ed. 1987) ("The killing of another human being under conditions specifically covered in law."); *The American Heritage College Dictionary 898* (3rd ed. 2000) ("To kill another human being unlawfully."); *Webster's New College Dictionary* 721 (2nd ed. 1999) ("To kill unlawfully."); Bryan Garner, *Garner's Modern American Usage* 533 (Oxford University Press 2003) ("The killing of another human being."); *Webster's Third New International Dictionary* 1488 (1986) ("The crime of killing a person under circumstances specifically defined by statute."); *American Heritage Dictionary of the English Language* 863 (1973) ("To kill unlawfully."); *Merriam-Webster's Collegiate Dictionary* 764 (10th ed. 2000) ("To slaughter wantonly.").

that "murder" in the charge meant anything other than intentionally causing death. Hall's counsel did dispute whether there was evidence Hall knew Pitonyak had been *charged* with "intentional murder" before the pair crossed the border (as required to convict her for the felony hindering-apprehension offense), but neither party questioned before the jury that "murder" meant intentional murder.

On appeal, Hall argues that "the lack of powder residue showed a shooting from a distance," a reference to Dr. Peacock's testimony that the absence of powder residue on Cave's body indicated that the fatal shot was fired from at least eighteen inches away. Hall apparently suggests that the jury would have found, based on the distance of the shot, that Hall knew Pitonyak had acted recklessly or negligently rather than intentionally or knowingly. However, the record also contains strong evidence from which the jury reasonably could have concluded that Pitonyak shot Cave with intent to kill her (e.g., his assertions to Sullivan that he had been in a gunfight and his subsequent efforts to avoid apprehension), and that Hall would have known these facts at the time of her offense from the circumstances of the crime and its aftermath. Hall also asserts that "the State argued it was unknown why Pitonyak killed Cave." This statement refers to a portion of the State's closing argument in which counsel, responding to Hall's insinuations that Pitonyak killed Cave to dismember her, merely emphasized that "we don't have to prove . . . motive," but used the concept that Pitonyak's motive could be inferred from the evidence to illustrate that the jury could likewise draw inferences regarding Hall's motives to assist in the dismemberment and flight.

Having reviewed the trial record, we believe it more plausibly supports the inference that the jury would have equated "murder" with intentionally causing a person's death, and

that it convicted Hall based on that understanding. We cannot infer from this record that the jury actually applied a definition of "murder" less demanding than that in the penal code. Consequently, we conclude that the district court's failure to include the penal code's definition of "murder" in the charges did not cause Hall egregious harm. We overrule Hall's fourth point of error.

**Suppression of evidence**

In her remaining points of error, Hall argues that she is entitled to a new trial on guilt or at least punishment because the State suppressed evidence of her alleged self-incriminating statements to Sullivan and impeachment evidence against Langenbach and Conley. A defendant in a criminal case has no general right to pretrial discovery of evidence in the State's possession. *See Michaelwitz v. State*, 186 S.W.3d 601, 612 (Tex. App.—Austin 2006, pet. ref'd). However, under *Brady* and its progeny, the United States Supreme Court has recognized "what amounts to a federal constitutional right to certain minimal discovery." *Id.* (quoting 42 George E. Dix. & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 22.21 (2d ed. 2001)). These authorities hold that "[t]o protect a criminal defendant's right to a fair trial, the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the prosecution to disclose exculpatory and impeachment evidence to the defense that is material to either guilt or punishment," *Ex parte Reed*, 271 S.W.3d 698, 726 (Tex. Crim. App. 2008), and that the State's failure to comply with this duty constitutes harm requiring reversal and a new trial. *See Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). On the other hand, there is no general due process right to advance notice of inculpatory evidence that the State intends to use against the defendant at trial. *See Weatherford v. Bursey*, 429 U.S. 545, 559-61 (1977). Additional discovery beyond the *Brady*

41

minimum may, however, be ordered by the trial court. *See* Tex. Code Crim. Proc. Ann. art. 39.14 (West Supp. 2008). Such an order imposes on the State a continuing duty of disclosure. *See Crane v. State*, 786 S.W.2d 338, 348 (Tex. Crim. App. 1990).

### *Sullivan*

Prior to trial, Hall filed a motion for discovery of numerous documents and things, including "[a]ll written or oral statements concerning the events of the alleged offense herein purportedly made by Defendant to any person." The district court signed this motion, "Granted in accordance with discovery statute & rules." *See* Tex. Code Crim. Proc. Ann. art. 39.14(a) (West 2008). In compliance with this discovery order, the State produced a copy of the reporter's record of the testimony Sullivan had given in Pitonyak's trial. In that trial, Sullivan gave an account of Pitonyak's 3:00 a.m. visit to her condo that was similar to the account she subsequently provided in Hall's trial. Sullivan also testified during Pitonyak's trial, similar to Hall's trial, that she had visited Pitonyak in jail "maybe like five" times, that Hall had sought her out through her Facebook page "because she had heard that I was visiting or had visited Colton at the jail," and that she had allowed Hall to accompany her on one of those visits. However, in contrast to her later testimony in Hall's trial, Sullivan made no claim during Pitonyak's trial that Hall had made any statements to her regarding Cave's dismemberment, much less any admissions implicating herself in such acts. The State did not divulge the existence of any statements by Hall to Sullivan implicating herself in the dismemberment until Sullivan was already on the stand testifying in Hall's trial. There is no dispute that the State had prior knowledge of the alleged statements and intended to elicit Sullivan's testimony about them, yet did not disclose their existence to Hall.

42

Over the objections of Hall's trial counsel, and after a one-day postponement of Sullivan's testimony in an attempt to cure any unfair surprise, the district court permitted the State to elicit Sullivan's testimony about Hall's alleged self-incriminating statements to her. In her fifth point of error, Hall argues that the district court abused its discretion in admitting Sullivan's testimony and in overruling the same complaint in Hall's new trial motion. Hall asserts that the record establishes that the State wilfully failed or refused to disclose the statements in violation of the discovery order. She relies on the rule that evidence wilfully withheld from disclosure under a discovery order should be excluded from evidence. *See Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006) (stating that "[e]vidence wilfully withheld from disclosure under a discovery order should be excluded from evidence" and holding that admission of such evidence was an abuse of discretion) (citing *Hollowell v. State*, 571 S.W.2d 179, 180 (Tex. Crim. App. 1978)); *see also Osbourn v. State*, 59 S.W.3d 809, 816 (Tex. App.—Austin 2001) ("the extreme sanction of exclusion should not be imposed absent wilfulness on the part of the prosecution."), *aff'd*, 92 S.W.3d 531 (Tex. Crim. App. 2002).[21] "Wilfulness" denotes that the prosecutor "acted with the specific intent to wilfully violate the discovery order," "made a conscious decision to violate the plain directive of the discovery order," or violated the order in a "calculated effort to frustrate the defense." *See Oprean*, 201 S.W.3d at 727-28.

---

[21] Thus, we are not called upon to address "what remedies are available when the State's conduct is of a less culpable nature." *State v. LaRue*, 152 S.W.3d 95, 100 (Tex. Crim. App. 2004). Likewise, Hall does not appear to contend on appeal that the district court abused its discretion in failing to provide any remedy short of excluding Sullivan's testimony.

43

Hall further argues that she was harmed by the admission of Sullivan's testimony about the statements. Even if the district court abused its discretion in admitting the testimony in the face of a wilful discovery order violation, a showing of harm is still required for reversal on appeal. *See Cooks v. State*, 844 S.W.2d 697, 734 n.31 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 927 (1993); *Hollowell*, 571 S.W.2d at 180. Because Hall's complaint is based on the discovery order violation rather than the substantive inadmissibility of the statements, the harm we consider is that caused by the State's failure to disclose the statements as required by the discovery order. *See Cooks*, 844 S.W.2d at 734 n.32; *Oprean v. State*, 238 S.W.3d 412, 415 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (op. on remand). "In so doing, we take into consideration the intended purpose of the discovery order: to prevent surprise and to permit appellant to prepare an adequate defense." *Oprean*, 238 S.W.3d at 415.

The State has conceded that it violated the discovery order in failing to disclose Hall's statements to Sullivan.[22] Nevertheless, it maintains that the district court did not abuse its discretion in admitting the testimony because the record demonstrates its violation was not wilful. The State further asserts there is no harm from any wilful discovery order violation because the district court took measures to mitigate any unfair surprise or prejudice.

---

[22] In response to Hall's motion for rehearing, the State argues, for the first time, that there was no violation of the discovery order after all because the order did not require the State to disclose the statements in question, that the court would have exceeded its authority under article 39.14 if it had ordered such disclosure, and that we should construe the trial record as reflecting the district court's determination that its order did not require such disclosure. As with the State's similar reversal in position regarding the definition of "murder" in the jury charge, we do not consider these new contentions. *See Rochelle*, 791 S.W.2d at 124; *Chang*, 76 S.W.3d at 637-38.

As with other rulings admitting or excluding evidence, we review the district court's decision to admit Sullivan's testimony under an abuse-of-discretion standard of review. *Id*. at 726. We also review the court's ruling on Hall's motion for new trial under the same standard. *See Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). Under this standard, an appellate court should uphold a trial judge's ruling unless it is outside the "zone of reasonable disagreement." *Oprean*, 201 S.W.3d at 726. We afford "almost total deference" to any explicit written or oral fact findings by the district court "based on an evaluation of credibility and demeanor." *Id*. (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). In the absence of such findings, we "view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *Id*. (quoting *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)). Hall's appellate contentions, in substance, are challenges to the district court's findings (whether express or implied) that the State did not violate the discovery order wilfully and its failure to find harm. We accordingly evaluate the record support for those findings.

Sullivan was initially called to testify during the morning of the first day of Hall's trial. After Sullivan testified that Hall had asked to accompany her on one of her visits to Pitonyak in jail, Hall's counsel asked to approach. A bench conference ensued in which the State revealed for the first time that Sullivan "has had discussions with Laura Hall regarding her involvement in the case, but they are not in any statements" it had previously produced pursuant to the discovery order. The State further indicated that Sullivan "informed us of this when we were discussing her coming here for this trial." Hall's counsel vigorously objected to Sullivan testifying about alleged

45

admissions or statements by his client that the State had not produced as required by the discovery order. The district court recessed the trial and held a hearing out of the jury's presence to determine the nature of the statements in question and when the State had obtained them.

During the hearing, Sullivan testified that the first time she had discussed Hall's statements with prosecutors "would have been about last week on the phone." The record reflects that Sullivan was testifying on a Tuesday. The district court ordered that Sullivan's testimony would not be permitted "until I have had further information" and Hall's counsel had "an opportunity to talk to the witness before any further direct or cross-examination on this particular issue."[23] Trial proceeded with the State calling other witnesses.

Later, during the lunch recess that day, the record reflects that the district court instructed a reluctant Sullivan to submit to an interview with Hall's counsel. The court also required the State to produce notes that its second-chair prosecutor had made during two pretrial interviews with Sullivan. The prosecutor represented to the district court that her first interview had been "last week," though she did "not know exactly what date that was," and that the other was "yesterday." Following the recess, Hall's counsel represented that Sullivan had told him she had revealed the statements to the State not later than Monday or Tuesday of the preceding week. Hall's counsel urged again that evidence of the statements should be excluded because the State had violated the discovery order. Counsel also urged that he had been unfairly surprised by Sullivan's sudden

---

[23] The district court stated, "You have a duty to disclose this immediately if it's an admission. Those are the rules. There's no doubt about that." The court ruled that Sullivan's testimony is "not coming in right now this morning, I can guarantee you that."

46

transformation from an innocuous background witness into one of the State's primary champions implicating Hall in the charged offenses.

The State's lead prosecutor apologized for the discovery order violation, but represented to the district court that "it was certainly not an intentional act." He suggested that the State's trial team had inadvertently overlooked its duty to disclose the statements during the "hectic few days" leading up to trial. The State further urged that any harm from its violation "was cured by the opportunity for [Hall's counsel] to visit with the witness." The district court took the matter under advisement and trial continued.

Following the testimony of the afternoon's first witness, the record reflects that Hall's counsel tendered a handwritten motion for continuance to the district court. The motion itself is not in the appellate record, although the district court and the parties discuss some of its contents on the record. From this record, it appears that the continuance motion was conditioned on the district court's denial of Hall's motion to exclude Sullivan's testimony.[24]

During a subsequent recess that day, the district court returned to the issue of Sullivan's testimony. It stated on the record that Hall's counsel "has had an opportunity to discuss her testimony and further inquiry to see what she has to say," that "the record has been made as to when the State actually acquired this information," and that a discovery order had been in place. The court also observed that Hall had filed a motion for continuance and stated that "part of the motion asks for . . . an opportunity to interview the witness. That has been granted." The court emphasized

---

[24] When tendering the continuance motion to the district court, Hall's counsel requested that the court "reserve ruling on it until you do the other."

that the statements in question were "[n]ot Brady" but "non-exculpatory and non-mitigating," and suggested that Hall presumably would be aware of any such statements she had made and could assist her counsel with that information. The district court then stated, "I do not find that the State withheld these in bad faith or wilfully in any way to infringe upon the defendant's right to have adequate defense."

The district court then denied Hall's motion to exclude Sullivan's testimony "as of now." "[I]n an abundance of caution," however, the court postponed any further testimony from Sullivan until the following day so as to afford Hall "further opportunity to investigate any other matters with regard to this witness." The court suggested that it might revisit its rulings if "anything further is presented" regarding Sullivan's testimony.

Hall did not raise any additional objections regarding Sullivan's testimony before it resumed on the following afternoon. Nor did Hall obtain any further rulings on her continuance motion or seek additional delay.

When Hall re-urged her complaint regarding the admission of Sullivan's testimony in her motion for new trial,[25] her trial counsel submitted an affidavit in which he detailed differences in trial strategy and additional investigation he would have pursued to impeach Sullivan and demonstrate that she had fabricated her account of Hall's admissions. Specifically, counsel presented evidence that he would have obtained: (1) testimony from Pitonyak's trial counsel that Sullivan had not mentioned Hall's admissions during a pre-trial interview; (2) testimony from

---

[25] Hall also alleged that the State knew or should have known that Sullivan had fabricated her testimony about the admissions. Hall has not pressed this claim on appeal.

48

witnesses who claim they saw Sullivan, who had been attending Pitonyak's trial, cry when the verdict was announced; (3) the phone records of any calls Hall and Sullivan had with each other; and (4) jail records showing that Sullivan continued to visit Pitonyak in the county jail until May 2007—three months before Hall's trial—when he was transported to prison.

The State tendered an affidavit from its second-chair prosecutor explaining the circumstances in which she had obtained the statements from Sullivan. The prosecutor recounted that the prosecution team met with and interviewed Sullivan before Pitonyak's trial, but "we did not discuss Laura Hall with her at any time that I can recall." During the weeks prior to Hall's trial, the prosecutor claimed she had difficulty reaching Sullivan, who had moved to California, and had to subpoena her to testify. The prosecutor testified that she traded several messages and had "two or three" brief conversations with Sullivan before they "finally had a longer conversation that included working out personal service, travel arrangements and a discussion of the Laura [H]all case." Regarding the timing of this conversation, the prosecutor acknowledged, "I believe this was a week or so prior to trial."

Following this call, according to the prosecutor, Sullivan was finally served with process on the Thursday or Friday before trial, and flew to Austin on the Sunday before trial. She "believe[d] that we first met in person regarding the Laura Hall case" at 8 a.m. on Tuesday, the first day of trial. During this meeting, they "discussed all questions we anticipated asking at trial and when she would be testifying."[26] The prosecutor added that, as reflected in the trial record, "I

---

[26] Responding to Hall's charge that the State knowingly presented false testimony, the prosecutor averred that Sullivan had "appeared to be honest and truthful," and that "I had no indication that her statements were false or fabrications."

49

took notes from our telephone discussion and face to face meeting." She further averred that these notes were "immediately" disclosed "[o]nce the question arose as to whether the State was required to disclose the statements." However, the prosecutor's affidavit is silent as to any explanation for the State's failure to disclose the statements at any of the earlier junctures at which the record reflects the State possessed some version of the statements—following the phone conversation with Sullivan the preceding week, following the Tuesday morning meeting, or during the State's pretrial preparations to examine Sullivan about those very statements.

In denying Hall's new trial motion, the district court made the following written findings of fact pertinent to Sullivan's testimony:

16. Nora Sullivan testified for the State that the Defendant had made incriminating comments to Sullivan prior to trial;

17. The State's counsel knew Sullivan claimed the Defendant made these statements but did not disclose those statements to the defense prior to trial;

18. When Sullivan began to testify to the non-disclosed statements, a recess was called to permit defense counsel to interview Sullivan about these statements;

19. Defense counsel was permitted to interview Sullivan before she was recalled to testify.

Although the district court had stated an oral finding regarding the State's wilfulness during trial, it made no explicit finding on that issue in connection with Hall's new trial motion.

The trial record reflects that the State had come to trial prepared to examine Sullivan about the statements; the statements' existence was not a sudden revelation to the State while Sullivan was on the witness stand. In fact, the State's second-chair prosecutor took notes reflecting

50

these statements during a phone conversation with Sullivan that, she admitted, occurred "a week or so prior to trial." She also acknowledged that the statements were discussed again during a face-to-face meeting with Sullivan at 8 a.m. on the first morning of trial. The State did not call Sullivan to testify that day until after opening statements and four other witnesses had testified. There is no suggestion that the State was unaware of the discovery order. Nonetheless, the State did not disclose the statements until after it was already beginning to elicit Sullivan's testimony about them—and then only after Hall's trial counsel inquired whether the State's line of inquiry was delving into statements it had not disclosed under the discovery order.

The State asserts that its failure to disclose the statements was "an oversight attributable to the fact that the information was not received until the hectic week before trial," as the first-chair prosecutor had suggested at trial, adding that the district court (at least at trial) had explicitly found the non-disclosure not to be wilful or in bad faith.[27] It further urges us to infer that Sullivan's statements were not fully "fleshed out" until the face-to-face meeting at 8 a.m. on the first morning of trial. It nonetheless remains that the State offers no explanation for its failure thereafter to disclose the statements before putting Sullivan on the stand later that morning and attempting to elicit those statements from her. This record establishes that the State acted wilfully in failing to disclose the statements at least after its 8 a.m. meeting with Sullivan, if not earlier. *See Oprean*, 201 S.W.3d at 727-28.

---

[27] We observe that when the first-chair prosecutor later presented an affidavit in opposition to Hall's new trial motion, he did not address the issue of Sullivan's statements.

51

To conclude that the district court's admission of Sullivan's testimony is reversible, however, a showing of harm is required. *See Cooks*, 844 S.W.2d at 734 n.31; *Hollowell*, 571 S.W.2d at 180. Specifically, the State's failure to disclose the statements upon learning of them—which occurred about one week before trial, at the earliest—must have unfairly surprised Hall and prevented her from presenting an adequate defense. *See Oprean*, 238 S.W.3d at 415. On this record, there is no showing of harm because Hall has failed to preserve any complaint that any unfair surprise or prejudice remained after the one-day postponement the district court provided.

As previously explained, the reporter's record reflects that Hall filed a handwritten motion for continuance, but the motion itself does not appear in the appellate record. The sole indication of the specific relief Hall requested in her motion, and the sole ruling on the motion that is reflected in the record, is the district court's statement during the first afternoon of trial that it had granted a part of the motion by postponing Sullivan's testimony for a day to afford Hall's counsel the opportunity to interview the witness. The district court emphasized that it would revisit its rulings regarding Sullivan's testimony if "anything further is presented" after Hall's counsel had "further opportunity to investigate any other matters with regard to this witness." Thereafter, Hall did not object or complain that the one-day postponement the district court had provided was insufficient to cure any unfair surprise or prejudice caused by the State's discovery order violation. In short, there is no indication in the appellate record that Hall requested or was denied any delay greater than that which the district court afforded her. Consequently, there is no showing of harm from the admission of Sullivan's testimony. *See Lindley v. State*, 635 S.W.2d 541, 544

52

(Tex. Crim. App. 1982) (failure to request a continuance waives error on the basis of surprise or violation of a discovery order).[28]

Absent a showing of harm, we cannot hold that any abuse of discretion in admitting Sullivan's testimony was reversible error. We overrule Hall's fifth point of error.

### *Langenbach*

In her remaining two points of error, Hall asserts that the State failed to disclose impeachment evidence as required under *Brady* and that the district court, consequently, abused its discretion in overruling these grounds in her motion for new trial. With regard to Langenbach, Hall complains that the State failed to produce information in its possession that the witness had been

---

[28] We also observe that, even without the additional investigation Hall's counsel desired, counsel was able to raise some inferences at trial regarding Sullivan's credibility and her motives to fabricate her account of Hall's statements. Hall's counsel attempted to raise the inference that Sullivan had recently fabricated a lie to implicate Hall out of anger or spite related to Pitonyak's conviction and the *Pitonyak* jury's evident rejection of his theory that Hall, not he, had dismembered Cave's body. Counsel highlighted the facts that Pitonyak had shown up at Sullivan's door at 3:00 a.m.; that she had not called police after seeing him armed, with blood on him, claiming to have been in a gunfight; and that she had repeatedly visited Pitonyak in jail. He also questioned Sullivan about testimony the jury had previously heard from Richard Barberia, one of the Austin police officers who had investigated the crime scene. Barberia recounted that some residents of the condominium complex had informed him that a woman, who later turned out to be Sullivan, "was acting kind of weird." He located Sullivan and spoke with her. According to Barberia, Sullivan asked "what had happened and who was the girl?" "That question concerned me," Barberia explained, "for I did not remember telling her that a woman was involved." Sullivan had also indicated to Barberia that Pitonyak was "a good friend of hers," that she had seen Pitonyak on Tuesday, August 16, and that he had attempted to call her during the evening of Wednesday, August 17 (when Pitonyak was preparing to flee or was fleeing to Mexico). Hall's counsel also questioned Sullivan as to why she had never previously divulged Hall's alleged admissions, despite having testified in Pitonyak's trial and been interviewed by counsel in that case. He also accused Sullivan of being angry or "festering" over Pitonyak's conviction, which she denied. This line of questioning, however, was ultimately limited by counsel's inability to impeach Sullivan with details about her relationship with Pitonyak and her display of emotions regarding his verdict.

convicted in New Zealand on a count of kidnaping and two counts of "uttering," a crime similar to forgery, and had been charged in Travis County with tampering with a government record for lying about her New Zealand convictions on a Texas real estate license application.

To establish a due process violation under *Brady*, a defendant must show that: (1) the State failed to disclose evidence in its possession; (2) the withheld evidence is favorable to the defendant; and (3) the evidence is "material," that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Webb v. State*, 232 S.W.3d 109, 114 (Tex. Crim. App. 2007) (citing *Hampton*, 86 S.W.3d at 612). The evidence may be material to either guilt or punishment. *Brady*, 373 U.S. at 87. Evidence that could be used effectively to impeach a prosecution witness, including prior convictions, is evidence favorable to the defendant for *Brady* purposes. *See United States v. Bagley*, 473 U.S. 667, 676 (1985); *Arroyo v. State*, 117 S.W.3d 795, 798 n.1 (Tex. Crim. App. 2003). The State's duty to disclose such evidence applies "irrespective of the good faith or bad faith of the prosecution," *Brady*, 373 U.S. at 87, and regardless of whether the defendant has previously requested it. *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006).[29]

There is no dispute that the undisclosed information about Langenbach's prior convictions was favorable evidence for *Brady* purposes. *See Bagley*, 473 U.S. at 676; *Arroyo*, 117 S.W.3d at 798 n.1. Nor, in our view, is there a serious question that the State had possession of this information. The State stipulated that the information had been contained in the

---

[29] In addition to the State's constitutional obligations, the district court specifically ordered the State to produce any *Brady* materials. In her sixth and seventh points of error, Hall does not complain of any concurrent violations of this discovery order.

Travis County District Attorney's files regarding the three Travis County offenses on which Langenbach was being held when she shared a cell with Hall. However, it claimed that the prosecutors in the Hall case were unaware of the files in the Langenbach case, and the district court so found.[30] Although the State did not dispute in its pre-submission briefing that it possessed the information for *Brady* purposes and had a potential duty to disclose it, it contended during oral argument and in a post-submission letter that "it no longer believes that it had such a duty because the prosecution team did not have knowledge of those convictions." The State suggests that because Langenbach's prosecution was "handled by a different section of [the] prosecutor's office, clearly not part of the prosecution team" in Hall's case, the Hall prosecution team had no duty to disclose *Brady* information contained in the office's files concerning the unrelated Langenbach proceedings. The State attempts to rely on the concept of a "prosecution team" that has developed in the case law to define the universe of prosecutors and investigators extending beyond the prosecutor's office whose knowledge of *Brady* material should be imputed to the prosecutor. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (prosecutors must not only disclose information within their own personal knowledge, but "have a duty to learn of any evidence favorable to the defense that is known to others acting on the government's behalf in the case, including the police."); *State v. Moore*, 240 S.W.3d 324, 328 (Tex. App.—Austin 2007, pet. ref'd) (distinguishing Texas Attorney General's Office from "prosecution team" of police, investigating agencies, and other agencies "closely aligned with the prosecution"). The State urges us to apply this "prosecution team" concept

---

[30] The court found that "[t]he prosecutors in the instant case did not review the files concerning prosecution of Langenbach and did not have personal knowledge of the New Zealand convictions."

55

within the single agency of the Travis County District Attorney, suggesting that it was required to disclose only the *Brady* materials known to the office employees personally involved in the Hall prosecution. We find no support for the State's position. *See Ex parte Richardson*, 70 S.W.3d 865, 871-73 (Tex. Crim. App. 2002) (duty under *Brady* applied despite prosecutor's lack of personal knowledge of favorable information in office files); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) (recognizing that a prosecutor's office is an "entity" and that information in the possession of one attorney in the office "must be attributed" to the office as a whole) (citing *Restatement (Second) of Agency* § 272 (1958)); *Moore*, 240 S.W.3d at 328 ("The duty to disclose under *Brady* arose only if the prosecutors or other members of the 'prosecuting team' knew of the investigation or had access to the information").

Whether the State's failure to disclose the impeachment evidence constituted a due process violation turns instead on whether the evidence was "material" under *Brady*. Undisclosed evidence is "material" to guilt or punishment "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id*. In other words, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The Supreme Court has further explained that this standard "is not a sufficiency of the evidence test"—"[a] defendant need not demonstrate that, after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."

56

*Id*. at 434-35. Instead, the defendant must "show[] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435. On the other hand, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Hampton*, 86 S.W.3d at 612 (quoting *United States v. Agurs*, 427 U.S. 97, 109 (1976)); *see also id*. (distinguishing this standard from the general standard for constitutional harmless error). The inquiry "involves balancing the strength of the [favorable] evidence against the evidence supporting conviction." *Hampton*, 86 S.W.3d at 613. We must accordingly consider "the entire body of evidence" at trial. *Id*. Similarly, we evaluate materiality "in terms of suppressed evidence considered collectively, not item-by-item." *Kyles*, 514 U.S. at 436. We consider the evidence in the light most favorable to the district court's ruling that the State's failure to disclose the additional criminal history information did not violate Hall's due process rights. *See Webb*, 223 S.W.3d at 115.

Our analysis of the undisclosed impeachment evidence's materiality begins with the fact that the State did disclose Langenbach's Travis County convictions and that Hall's trial counsel was able to utilize this evidence in an effective cross-examination. Prior to trial, the State provided Hall a "Notice of Witnesses' Criminal History" disclosing that Langenbach had three Travis County felony convictions, all dated October 17, 2005: (1) securing execution of document by deception, for which she was sentenced to two years in state jail, probated for a term of five years; (2) misappropriation of property by a fiduciary, for which she was sentenced to ten years in prison, probated for a term of ten years; and (3) another count of securing execution of a document by

deception, for which she was sentenced to two years in state jail, probated for a term of five years. During her direct examination, Langenbach acknowledged that she was currently on felony probation related to charges of securing execution of a document by deception and was being held on these charges when she shared a jail cell with Hall. Hall's trial counsel began his cross-examination of Langenbach by inquiring whether she had previously been to prison for any other conviction. Langenbach responded, "Yes, sir." The following exchange ensued:

Q: And where was it, ma'am?

A: In New Zealand.

Q: For what offense?

A: I tried to help a friend adopt a baby and in order to get the baby to the United States, she needed an American passport for the baby and I went with her to the American embassy.

Q: And you were convicted of trying to—fraudulently trying to obtain a passport?

A: No, of helping my friend adopt a baby.

Q: Is the adoption of a child a crime in New Zealand?

A: Because it wasn't executed in New Zealand.

Hall's counsel then proceeded to question Langenbach about her Travis County convictions, eliciting her acknowledgment that each crime involved her deceiving and harming others for her own benefit.[31] For example, Langenbach responded in the affirmative to counsel's question, "In each

---

[31] Hall's counsel and Langenbach had the following exchange:

58

Q:     What were you in jail for here in Travis County?

A:     Securing a document that had something to do with real estate.

Q:     The initial charge was securing the execution of a document by deception?

A:     Yes.

Q:     Deception means by lying or deceiving somebody?

A:     Yes, sir.

. . . .

Q:     So, similar to the charge that you had been in prison for in New Zealand, you were deceiving somebody?

A:     Yes, sir.

Q:     And then you also had a rap for misappropriation of property by a fiduciary?

A:     Yes, sir.

Q:     That means you were in a fiduciary duty to someone, took their property?

A:     Yes, sir.

Q:     And you had another case of securing execution of a document by deception separate from the other one; is that correct?

A:     It was all in one case, yes, sir.

Q:     Well, they were all in one case, but they were different counts, weren't they?

A:     Yes, sir.

Q:     And eventually—actually, you had a fourth case pending but it got dismissed, right?

A:     Yes, sir, I guess.  Yeah, I guess.

instance you stole something or swindled somebody, cheated somebody into signing things for you; is that right?" Counsel did not return to Langenbach's New Zealand convictions other than to elicit her affirmative response to the following question regarding her Travis County convictions: "So, similar to the charge that you had been in prison for in New Zealand, you were deceiving somebody?"

With this evidence of past criminal convictions involving fraudulent and dishonest conduct before the jury, Hall's counsel attempted to raise the inference that Langenbach had utilized facts about the crime she had heard in media reports to weave a false account that she could trade to authorities in exchange for favorable treatment. He elicited Langenbach's admissions that she knew the meaning of the term "jailhouse snitch" (as Hall's counsel described one, "somebody who gathers information on someone, supplies it to police authorities in exchange for some form of favorable treatment"), and that Langenbach had recognized Hall from television. Langenbach insisted that her account was based solely on Hall's statements to her and denied receiving any favorable treatment in exchange for her testimony.

Even without the additional impeachment evidence the State withheld, Langenbach's cross-examination based on her three Travis County convictions seriously damaged her credibility, informing the jury that she had a history and propensity to lie, cheat and scheme—to an extent of committing felony criminal offenses—to advance her own interests at others' expense. Evidence

---

Q:    In each instance you stole something or swindled somebody, cheated
      somebody into signing things for you; is that right?

A:    Yes, sir.

60

of the New Zealand convictions, of course, would have informed the jury that Langenbach had more convictions for this sort of misconduct and that her misconduct dated back to at least 1996. Nonetheless, the central fact that she had a history and pattern of such conduct was already before the jury. Similarly, Hall asserts that because the additional prior convictions would have increased Langenbach's likelihood of going to prison (and, at her age, dying there), they would have tended to establish greater incentives for her to lie to curry favor with authorities. But the jury already knew the key fact that Langenbach, with three pending felony charges, had strong incentives to be a "jailhouse snitch." Hall also complains that the additional impeachment information would have enabled her to better attack Langenbach's attempt to downplay her New Zealand offenses as a single incident of "helping my friend adopt a baby." However, the jury reasonably could have concluded that this assertion further undermined Langenbach's credibility, as she quickly acknowledged that adopting a baby was not a crime in New Zealand and that whatever offense or offenses she had committed actually had involved deceitful conduct similar to her Travis County offenses.

We must also consider the materiality of the undisclosed impeachment evidence in light of the role or importance of Langenbach's testimony in supporting Hall's convictions. To obtain its conviction against Hall for the lesser-included misdemeanor offense of hindering apprehension, the State was required to prove beyond a reasonable doubt that Hall, "with intent to hinder the arrest, prosecution, conviction, or punishment for Colton Pitonyak for the offense of murder," either (1) "harbor[ed] or conceal[ed] Colton Pitonyak" or (2) "assisted Colton Pitonyak in his flight from the State of Texas and provided transportation to Colton Pitonyak in his flight from the State of Texas." There was overwhelming evidence that Hall voluntarily supplied her

own vehicle for use in transporting Pitonyak across the Mexican border and drove the car herself.[32] The State also presented strong evidence, apart from Langenbach's testimony, tending to establish that Hall took these actions with knowledge of Cave's murder and intent to hinder Pitonyak's apprehension for the crime. Cell phone records demonstrated repeated contacts between Hall and Pitonyak during the early morning of August 17, and Martindill's testimony placed Hall at the condo later that morning. Said Aziz testified that Hall admitted, "I have been up in this shit since two hours after it started." Aziz added that Hall told him, with regard to their apprehension by Mexican police, "I can't believe they found us so fast," a statement implying an awareness that authorities would be searching for them. Aziz similarly recounted that he "asked Hall why she would want to help somebody who killed a girl very much like herself, to which she replied that she loves him and, quote, 'that's just how she rolls.'" The State also presented DNA evidence showing high probabilities that Hall had been in the condo during the day and—as reflected by her probability of exclusion as a contributor to DNA found on the shop towel—after Pitonyak's mid-afternoon trip to the hardware store. Further informing the inferences of guilt the jury reasonably could draw from this evidence, it heard considerable evidence that Hall was highly motivated to protect Pitonyak and seek his favor, despite his involvement in a murder and even if it meant breaking the law.[33]

Langenbach's testimony had greater relative importance in supporting Hall's conviction for tampering with physical evidence. To secure this conviction, the State was required

---

[32] *See supra* at 10-11.

[33] *See supra* at 13-15.

to prove, beyond a reasonable doubt, that (1) Hall, "either acting alone or with another as a party to the offense," (2) "knowing that an offense, to wit: a murder, had been committed," (3) "alter[ed] or destroy[ed] or conceal[ed] a thing, to wit, a human body or biological evidence,"[34] (4) "with intent to impair its verity or availability as evidence in any subsequent investigation of or original proceeding related to the offense." The district court instructed the jury on the law of parties: "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both," and that "[a] person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

As noted, there was strong evidence that Hall was physically present in Pitonyak's condo both before and after his trip to the hardware store, that she knew he had murdered Cave, that she was highly motivated to protect Pitonyak, and that she helped him flee to Mexico later that evening. However, there was little, if any, physical evidence connecting Hall directly to the dismemberment of Cave's body. Hall was excluded as a contributor to DNA found on the hacksaw, knives, machete, dust masks, and every other item found in the condo other than a blue shop towel from the living room and the flip-flops found in the bathroom. DNA evidence on Pitonyak's handgun did show a high probability that Hall had contacted the item at some point. However, the State's expert Carridine acknowledged that the mere fact one's DNA appeared on an item did not

---

[34] The State has acknowledged that "a human body or biological evidence" necessarily refers to Cave's body or "a subcomponent" of her body.

63

establish when the person made contact, where they made contact, or what they were doing.[35] There was also evidence that Hall had gassed up and washed her car while Pitonyak was buying a hacksaw and other supplies at the hardware store. While perhaps probative of Hall's plan to help in the escape to Mexico, it does not necessarily show her involvement in dismembering Cave's body.

The State's case against Hall for evidence-tampering ultimately rested upon evidence of Hall's alleged after-the-fact admissions. We have held that the district court did not commit reversible error in admitting Nora Sullivan's testimony about Hall's purported admissions to her. Sullivan squarely implicated Hall as a party to the offense, testifying that Hall admitted she "tried to motivate" Pitonyak "to get him to do it . . . to convince and get him moving" in "his task" of dismembering Cave's body. This testimony further informed the inferences that the jury drew from Hall's admission to Aziz that "I have been up in this shit since two hours after it started," and the impact of Rosalez's testimony that Hall admitted "she had helped [in some unspecified way] and then masterminded the escape to Mexico."

Langenbach, to be sure, provided the most detailed account of events in Pitonyak's condo on August 17, and was the only witness squarely implicating Hall in personally cutting on Cave's body. (Sullivan could testify to no more than her "impression" that Hall had directly participated). Nonetheless, balancing the strength of the impeachment evidence withheld by the State with the impeachment evidence already before the jury and the strength of the State's case,

---

[35] Nor was there any testimony—even from Langenbach— that Hall had fired the shot into Cave's severed head. Moreover, even if evidence could support an inference that Hall (perhaps out of jealousy or other dark emotion) had been the one to fire the shot into Cave's head, this would not necessarily support the further inference that Hall did so "with intent to impair its verity or availability as evidence."

*see Hampton*, 86 S.W.3d at 613, we conclude that the withheld impeachment evidence does not rise to the level of material in the constitutional sense. The State's case against Hall for misdemeanor hindering apprehension was very strong. While its case for evidence-tampering was less so, there was sufficient evidence to convict Hall, at least as a party, in light of Sullivan's testimony and the inferences it enabled the jury to draw from other evidence. Although the test for materiality does not turn on whether sufficient evidence remains to support the verdict if we ignore Langenbach's testimony, *see Kyles*, 514 U.S. at 434-35, we do balance the strength of this evidence against that of the undisclosed evidence to determine whether the latter would have placed the State's whole case as to either conviction in such a different light as to undermine our confidence in the jury's verdict and constitute a reasonable probability of a different outcome. *See id.*; *Hampton*, 86 S.W.3d at 613. In light of the impeachment evidence already before the jury, we cannot conclude that it would have. *Compare Webb*, 232 S.W.3d at 115 (in prosecution for sexual assault of a child, possibility that victim would file civil suit against defendant was not material "[i]n light of all the evidence presented against Appellant and the abundant impeachment evidence Appellant offered against the complainant"); *Saldivar v. State*, 980 S.W.2d 475, 486 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (undisclosed theft conviction was not material where witness's inconsistent statements permitted effective cross-examination, State's case was "strong," and witness's testimony was cumulative of other witnesses); *with Ex parte Richardson*, 70 S.W.3d 865, 871-73 (Tex. Crim. App. 2002) ("Applicant's trial counsel *did* impeach Ms. Hanson's testimony in other ways, but nothing presented at trial . . . could compare with a parade of six law enforcement officers testifying that, in their opinion, Ms. Hanson was not a credible witness"). While the additional impeachment possibly

"might have helped the defense, or might have affected the outcome of the trial" in regard to guilt-innocence, this "does not establish 'materiality' in the constitutional sense." *Hampton*, 86 S.W.3d at 612 (quoting *Agurs*, 427 U.S. at 109). To this extent, we overrule Hall's sixth point of error. We will address the implications of Langenbach's undisclosed convictions for Hall's punishment in the next section.

### *Conley*

In her seventh point of error, Hall argues that the district court abused its discretion in denying her a new punishment trial because the State violated *Brady* in suppressing impeachment evidence relating to Douglas Conley. Conley was the cab driver who was the State's sole witness during the punishment phase. He claimed that Hall, while riding in his cab, had referred to the murdered and decapitated Cave as "some bitch" and exhibited a demeanor toward the victim that Conley described as "just cold, callous."

Following trial, Conley contacted Hall's counsel and claimed that he had been unable to identify Hall in a photo line-up during his initial meeting with Austin police after reporting "Ashley's" alleged statements. He later supplied an affidavit in which he testified to these facts. Conley further asserted that he had raised the issue with prosecutors when meeting with them before testifying in Hall's trial. In response to his inquiry about the line-up, according to Conley, prosecutors showed him a single 8" x 10" photo to confirm Hall's identity and "told [him] not to worry about it."[36]

---

[36] Conley also professed "surprise" that prosecutors had contacted him after his meeting with police, that he "could not understand why defense counsel had not asked me about the photo lineup,"

66

In response, the State stipulated that, indeed, Conley had been unable to identify Hall's photo from the line-up. It also presented affidavit testimony from both the lead and second-chair prosecutor admitting that Conley, during a pre-trial meeting, had asked them about his previous difficulties in identifying Hall in the line-up. Their description of this conversation differed somewhat from Conley's version. Both prosecutors claimed that Conley had insisted that the woman in his cab was Hall. When asked how he knew, according to the prosecutors, Conley assured them he had seen Hall in media coverage on the case and could tell "Ashley" was Hall. The State also emphasized to the district court that Conley had identified Hall at trial as the woman in his cab, and that facts Conley testified "Ashley" told him corresponded to the evidence about Hall (e.g., the pending felony charge involving aiding a boyfriend accused of murder, and Rosalez's testimony that Hall had worked at Baby Acapulco's on Barton Springs Road that summer). The State presented further corroborating proof that there had been only five felony hindering-apprehension cases pending against white females in Travis County when Conley picked up "Ashley," one of which was against Hall.

In denying Hall's motion, the district court found that Conley had testified for the State "attributing disparaging statements about the victim to the defendant," that Conley had been shown a photo line-up and "was unable to identify the defendant from that photo line-up," that prosecutors had possession of that information from a report prepared by the police detective who had interviewed Conley and Conley's own inquiries, that "the defense team was not informed of

---

and that he "surmised that it was because the prosecutors neglected to share this information." Conley also stated, "I felt used and ashamed of my role in what I now believe was little more than a lynch mob seeking to unfairly convict Laura Hall."

the failure of Mr. Conley to identify Ms. Hall from the photo array prior to trial," and that there was no testimony concerning Conley's failure to identify Hall at trial. However, the court also found that "[t]here were additional identifying factors in Mr. Conley's narrative that supported the identification despite Conley's inability to identify the defendant from the photo line up."

There is no dispute that Conley's failure to identify Hall in a photo line-up and the prosecutor's subsequent actions to confirm her identity with Conley were impeachment evidence in the State's possession that it did not disclose to Hall. The parties join issue, however, as to whether this undisclosed evidence was material under *Brady*.

Unlike the largely cumulative impeachment evidence the State withheld regarding Langenbach, there was no other impeachment evidence before the jury about Conley. We also must agree with Hall that evidence Conley had been unable to identify Hall in a photo line-up during his first meeting with police—and that prosecutors had subsequently wood-shedded him before trial by showing him a single photo of Hall—would have been very powerful impeachment. Used effectively, this evidence could raise strong inferences that Conley, for whatever reason, had fabricated his account, or was at least mistaken.[37] We are unpersuaded by the State's arguments that

---

[37] Incidentally, in addition to volunteering his alleged account of Hall's ride to police, then volunteering his assistance to Hall in her new trial motion, Mr. Conley has similarly interjected himself into the proceedings on appeal, filing a pro se amicus curiae brief in support of Hall (and "in the public interest in support of the peace and dignity of the State of Texas"). Conley both vaguely disparages Hall's appellate counsel regarding an apparently unrelated matter and accuses the State of "gross prosecutorial misconduct" in attempting to prosecute Hall for evidence-tampering involving a human body (he questions whether a human body can be a "thing" under section 37.09 of the penal code). Conley further argues that the State acted "deceptively"or committed "perjury" in securing an indictment against Hall for felony hindering apprehension because Pitonyak had not yet been charged with murder when the pair fled Travis County. *See* Tex. Penal Code Ann. § 38.05 (a), (c), (d). As previously explained, the jury acquitted Hall of this offense and convicted her of the

68

this potential impact was effectively "cured" by Conley's in-court identification of Hall, as the jury would also have heard that Conley had been wood-shedded with the aid of Hall's photograph. Nor do we believe the State's corroborating proof resolves the problem, as the record reflects that many of these facts about Hall had been widely publicized in media reports about the case.[38] Conley, as noted, admitted that he had followed the news coverage on the case.

The State suggests that Conley's testimony was merely cumulative of guilt-innocence evidence to the effect that Hall was "cold" and "callous" regarding Cave's fate. The State emphasizes Langenbach's testimony that Hall articulated such shocking thoughts as wondering what "the big fuss was about" because Cave "was nothing. She was nobody. Colton had a full paid scholarship and Jennifer was just a waitress," and bragging, "How many grandmothers can tell their grandchildren that they cut up a body?" It also refers to Rosalez's testimony that Hall had termed Cave's murder and dismemberment a "victimless crime," Aziz's account of Hall's "'that's just how she rolls'" comment, and the content of Hall's Facebook page. And, lest we overlook the obvious, the jury did convict Hall of participating, at least as a party, in a gruesome decapitation and dismemberment of a murder victim.

Nevertheless, Conley played a uniquely critical role in regard to punishment. He was the State's sole witness during the punishment phase, and his testimony was clearly calculated to shock and disgust the jury one last time before it began its punishment deliberations. More

lesser-included offense of misdemeanor hindering apprehension, which did not require a finding that Hall knew Pitonyak had been charged with murder. *See id*.

[38] E.g., testimony of Martindill, Aziz, and Langenbach noting awareness from media reports concerning Cave's death and dismemberment, that Pitonyak had been charged with murder, that Hall had fled to Mexico with him, and that Hall had been charged with aiding him.

importantly, Conley was the State's primary witness establishing that Hall's "cold" and "callous" view of her crimes had persisted despite the passage of time. While Aziz and Langenbach testified to statements Hall made shortly after her return from Mexico, Conley testified to statements she allegedly made over a year afterward. The State emphasized this temporal relationship during its final closing argument on punishment, in which it urged the jury that Hall had evidenced a persisting lack of remorse confirming that she was beyond rehabilitation. The State argued:

> You can consider her words to Doug Conley in August of 2006, a year after Jennifer Cave was killed. He just killed some bitch. That's a lack of remorse and you can hold that against her. You cannot fathom someone who having seen what she saw did, what she did a year later, treat her like she never lived. That is a lack of remorse that you absolutely can consider.

After this statement, the State added, "The words she said to Javier Rosalez at very close in time and same place. Her lack of remorse shows you that she cannot be rehabilitated." It concluded by urging the jury, "There is no course of action you have but to send her to prison for the maximum sentence because of the mind that is on her shoulders. There is no one of you who I believe will take the risk of letting her out with anything less than the maximum sentence."

Although Rosalez did testify that Hall uttered her "victimless crime" statement in roughly the same time frame as her statements to Conley, he, unlike Conley, had been impeached with proof of two prior felony convictions. Furthermore, Langenbach, who provided the State's most graphic and sensational testimony attributing to Hall a callousness and lack of remorse, had also been solidly impeached. For these reasons, Conley's testimony would tend to have greater probative value relative to these witnesses. Alternatively, to the extent the jury would have afforded

70

much weight to Langenbach's testimony, it becomes significant that the State also withheld additional impeachment evidence on her. Although we concluded that this evidence was ultimately not material to Hall's guilt, we must consider it in conjunction with the suppressed impeachment evidence on Conley when evaluating the materiality of both in regard to punishment. *See Kyles*, 514 U.S. at 434-35 (we evaluate materiality "in terms of suppressed evidence considered collectively, not item-by-item.").

The record also reflects that, even on the state of the evidence presented at trial, the jury gave more than mere passing consideration to granting Hall probation on her evidence-tampering conviction. During its punishment deliberations, the jury sent out notes inquiring whether it could impose imprisonment for Hall's hindering-apprehension conviction and probation for evidence-tampering. It also inquired whether, if it granted probation, it had any control over the conditions of Hall's supervision.

On this record, we must conclude that the suppressed impeachment evidence against Conley was material—had it been disclosed and used effectively, it would have placed the State's punishment case in such a different light as to undermine confidence in the verdict and give rise to a reasonable probability of a different outcome. *See Kyles*, 514 U.S. at 434-35. This is especially so when considering the cumulative impact of this evidence together with the suppressed impeachment evidence against Langenbach. *See id.* at 436. In other words, we hold that because of the State's suppression of impeachment evidence, Hall did not receive the fair punishment trial that the Due Process Clause requires. We accordingly sustain Hall's seventh issue and, to this extent, her sixth issue.

**CONCLUSION**

We have overruled Hall's points of error challenging her convictions but sustained her points to the extent they challenge her punishment. Accordingly, we affirm the district court's judgments as to the findings of guilt, reverse those parts of the judgments imposing sentence, and remand the causes for a new trial on punishment. *See* Tex. Code Crim. Proc. Ann. art. 44.29(b) (West Supp. 2008).

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Waldrop

Affirmed in part; Reversed and Remanded in part on Motion for Rehearing

Filed: May 1, 2009

Publish