

## NUMBER 13-07-00532-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**MISAEL GONZALEZ,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 275th District Court
### of Hidalgo County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Vela
### Memorandum Opinion by Justice Rodriguez

A jury found appellant Misael Gonzalez guilty of capital murder.[1]  *See* TEX. PENAL

CODE ANN. § 19.03(a)(8) (Vernon Supp. 2010) (providing that a person commits capital

---

[1]Gonzalez was indicted on one count of capital murder, one count of murder, and one count of injury to a child.  *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1) (Vernon 2003), 19.03(a)(8) (Vernon Supp. 2010), 22.04(a) (Vernon Supp. 2010).  Because the murder allegation was submitted to the jury as a lesser-included offense of capital murder, the murder count was dismissed.  Although the jury found Gonzalez guilty of injury to a child in addition to capital murder, the State dismissed the injury to a child count because of double jeopardy concerns.

murder if he murders an individual under six years of age).  Because the State did not seek the death penalty, an automatic life sentence without the possibility of parole was imposed.  *See id*. § 12.31(a) (Vernon Supp. 2010).  By two issues, Gonzalez contends that the trial court erred (1) in admitting evidence not previously disclosed by the State in violation of a discovery order, and (2) in denying his request for a mistrial when a comment made by the prosecutor allegedly shifted the burden of proof to the defense.  We affirm.

## I. BACKGROUND[2]

Gonzalez provided conflicting accounts of the events that occurred on January 1, 2006.  In a statement given to investigators, Gonzalez said that he was alone with his five-month-old son, when the child began crying.[3]  Gonzalez explained that, in an attempt to stop the crying, he dropped the child to the floor three times.  After the third time, the child stopped breathing.  According to his statement, Gonzalez shook the child to get him to start breathing.[4]  At trial, however, Gonzalez testified that the child was in his swing inhaling but not exhaling.  According to his testimony, Gonzalez picked the child up and shook him, but he did not respond.  As reflected in Gonzalez's statement and in his trial testimony, Gonzalez was taking the child to get help when Yajayra Hernandez, the child's mother and Gonzalez's girlfriend, returned to the apartment, having been gone for approximately ten minutes.  After Hernandez arrived at the apartment, Gonzalez, Hernandez, and Gonzalez's

---

[2]Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it.  *See* TEX. R. APP. P. 47.4.

[3]Gonzalez's statement was admitted at trial.  The jury was instructed that it should consider Gonzalez's statement only if it believed, beyond a reasonable doubt, that Gonzalez made it voluntarily.  Gonzalez does not challenge the voluntariness of his statement on appeal.

[4]Gonzalez testified that investigators added information to his statement that he did not say, including his comments about dropping the child.  He agreed that he told the investigators that he shook the child when he stopped breathing.

2

aunt took the child to a fire station and from there he was transported to a hospital by ambulance. Finally, both Gonzalez and Hernandez testified that the child had fallen a number of times: once, in October, from his car seat; a second time from or in the kitchen sink; and, a third time on Christmas Eve.

Vincent Vann, Jr., M.D., a physician specializing in ophthalmology and retina surgery, and Krishna Turlapati, M.D., a pediatric intensive care specialist, testified at trial. Both treated the child upon his admission to the hospital on January 1, 2006, and both concluded that the child's symptoms and their findings were consistent with Shaken Baby Syndrome. Pathologist Fulgencio Salinas, M.D., performed the autopsy on the child. He testified that the child's injuries were consistent with blunt force or impact trauma and that, based on subdural hemorrhaging of his brain, a hematoma on the right side of the brain, and three skull fractures, the cause of the child's death was Shaken Baby Impact Syndrome.

James Lukefahr, M.D., a pediatrician and medical school professor, testified as the State's expert. Based on his review of the child's medical records, witness statements, autopsy report, and the summary of the Child Protective Service's investigation, Dr. Lukefahr concluded that the child had been the victim of inflicted, non-accidental injuries; that the injuries consisted of head injuries, eye injuries, skeletal injuries, and fractures including bending rib fractures; and that the injuries had all occurred around the same time on January 1, 2006.[5] According to Dr. Lukefahr, the January 1st determination is

---

[5]Dr. Lukefahr agreed that there was a discrepancy between the autopsy report that identified rib fractures and the radiology report that reported no rib fractures. Dr. Lukefahr explained that he had looked at the x-rays under magnification and found the hard-to-see bending fractures noted in the autopsy report. He also identified an acute injury to the area between the lining of the lungs and the rib cage. According to Dr. Lukefahr, these injuries could not have occurred around Christmas and could not have been caused by performing CPR on the child.

consistent with the finding of fresh blood between the skull and the brain. In Dr. Lukefahr's opinion, the child had experienced "blunt force trauma and rotational trauma over a very short period of time." He testified that "[t]here was clearly impact injury to this baby, and there was clearly rotational trauma . . . [with] the head . . . moving very quickly in multiple directions to get the subdural bleeding and the retinal hemorrhages." Dr. Lukefahr also explained that the retinal hemorrhages, a significant factor supporting his conclusion that the child had suffered inflicted, non-accidental trauma, could have only come from rotational trauma involving shaking, jerking, or twisting the baby's head. During cross-examination, Dr. Lukefahr agreed that the ambulance report and hospital emergency room records did not mention any external injuries and that there were no injuries to the child's neck.

James Keith Rose, M.D., testified as a medical expert for the defense.[6] He reviewed, among other things, the child's medical records, including reports, films, and CDs, the autopsy report, and the transcript of Dr. Lukefahr's trial testimony. In Dr. Rose's opinion, the child's death resulted from anoxia caused by Sudden Infant Death Syndrome (SIDS). Among other things, Dr. Rose believed that: (1) the child's skull fractures were caused by a fall that had nothing to do with his death; (2) the hematoma occurred more than twenty-four to forty-eight hours earlier; and (3) whatever happened had already resolved externally and was resolving internally. While retinal hemorrhages can be the result of shaking a child, Dr. Rose opined that, in this case, they had been caused by

---

[6]Dr. Rose, a practicing physician, testified that he went to medical school at the University of Texas Medical Branch and trained in the areas of emergency medicine, general surgery, plastic surgery, and pediatric plastic and critical care.

4

aggressive resuscitation, DIC (disseminated or diffuse intravascular coagulation), and intra-cranial pressure. Dr. Rose further explained that a swollen brain can be caused by anoxia, which was the diagnosis (anoxic encephalopathy) given the child when he was admitted to Mission Hospital and when he was transferred to McAllen Medical Center. Dr. Rose did not agree with Dr. Lukefahr's opinion that the swelling of the child's brain was caused by blunt force trauma, explaining that if blunt force trauma had been the cause, there would have been "blood everywhere" and the trauma would have caused swelling that would have pushed the brain down through the bottom of the skull compressing the brain stem and causing the child to stop breathing. In Dr. Rose's opinion, this did not happen. Rather, the child had diffuse, symmetrical, consistent brain swelling caused by anoxia. Dr. Rose also explained that if the swelling was caused by trauma there would also have been neck injuries, and the child, in this case, had no neck injuries, as acknowledged by Dr. Lukefahr.

The State called Norma Farley, M.D., a forensic pathologist, as a rebuttal witness. Having reviewed the medical records and autopsy photographs and having heard Dr. Rose's testimony, Dr. Farley testified that, in her opinion, the child's brain injuries were not consistent with SIDS. Rather, in Dr. Farley's opinion, the child's injuries were from inflicted trauma because there were at least three skull fractures and retinal hemorrhaging; retinal folds are usually the result of significant trauma; Dr. Vann had noted left facial hematomas on his external exam; and the radiologist had found multiple fractures of the occipital bone in the back of the head and non-displaced fractures of the left forearm. Dr. Farley did not agree with Dr. Rose's determination that the fractures were from an earlier fall because, in her opinion, whatever happened to the child happened on January 1, 2006.

5

## II. Discussion

## A. Admission of Undisclosed Exhibits

In his first issue, Gonzalez contends that the trial court erred in admitting exhibits not previously disclosed by the State.

### 1. Standard of Review and Applicable Law

> When reviewing a trial judge's decision to admit or exclude evidence, an appellate court must determine whether the judge's decision was an abuse of discretion. . . . And when the trial judge fails to enter written or oral findings of fact, an appellate court will "view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record."

*Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006) (quoting *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000) (en banc)) (other citations omitted).

Gonzalez's appellate contentions are challenges to (1) the trial court's implied finding that the State did not violate the discovery order willfully, and (2) its failure to find harm.[7] *See Hall v. State*, 283 S.W.3d 137, 165 (Tex. App.–Austin 2009, pet. ref'd) (op. on reh'g) (citing *Cooks v. State*, 844 S.W.2d 697, 734 n.32 (Tex. Crim. App. 1992); *Oprean v. State* (*Oprean II*), 238 S.W.3d 412, 415 (Tex. App.–Houston [1st Dist.] 2007, pet. ref'd) (op. on remand)). We accordingly evaluate the record support for those findings.

---

[7]At the evidentiary hearing, Gonzalez challenged the content of the exhibits, objecting that the exhibits contained hearsay, were duplicitous, repetitive, and irrelevant, and provided summation information. All objections were overruled, and Gonzalez does not complain about these rulings on appeal. *See id*. at R. 47.1. Gonzalez does complain that the images were improperly enhanced or manipulated. He did not, however, object on that basis during the hearing or when he re-urged objections at trial. Therefore, Gonzalez has not preserved this aspect of the substantive inadmissibility of the exhibits for our review. *See id*. at R. 33.1a (setting out that when an appellate complaint fails to comport with the trial objection, nothing is preserved for review); *see also Hall v. State*, 283 S.W.3d 137, 165 (Tex. App.–Austin 2009, pet. ref'd) (citing *Cooks v. State*, 844 S.W.2d 697, 734 n.32 (Tex. Crim. App. 1992); *Oprean v. State* (*Oprean II*), 238 S.W.3d 412, 415 (Tex. App.–Houston [1st Dist.] 2007, pet. ref'd) (op. on remand)).

"Evidence willfully withheld from disclosure under a discovery order should be excluded . . . ."  *Hollowell v. State*, 571 S.W.2d 179, 180 (Tex. Crim. App. 1978). Therefore, the relevant inquiry is whether the prosecutor acted with specific intent to willfully disobey a discovery order when she failed to disclose evidence as ordered.  *See Oprean*, 201 S.W.3d at 727; *Walker v. State*, No. 01-08-00557-CR, 2009 Tex. App. LEXIS 8347, at **7-12 (Tex. App.–Houston [1st Dist.] Oct. 29, 2009, pet. dism'd, untimely filed) (designated for publication).  When discussing whether a prosecutor acted willfully, the court of criminal appeals has considered the following:  (1) whether the prosecutor intended to harm the defense; (2) whether the prosecutor's actions were a strategic and purposeful effort to thwart the defense's preparation of its case; (3) whether the prosecutor acted with a specific purpose or conscious decision to disobey the court's discovery order; (4) whether the prosecutor's explanation for violating the discovery order was valid; and (5) whether the prosecutor discovered or received the evidence at a time or in a manner such that compliance with the terms of the discovery order was impossible.  *Oprean*, 201 S.W.3d at 727-28 (citing *LaRue v. State*, 152 S.W.3d 95, 96-99 (Tex. Crim. App. 2004) (en banc)); *Walker*, 2009 Tex. App. LEXIS 8347, at **8-9.

If it is determined that the prosecutor acted willfully and the trial court erroneously admitted the complained-of exhibits, harm must be shown to require reversal.  *See Cooks*, 844 S.W.2d at 734 n.31 (citing *Hollowell*, 571 S.W.2d at 180).  In this case, the harm we consider is that caused by the State's failure, if any, to disclose the exhibits as required by the discovery order.  *See id*. at 734 n.32.  "In so doing, we take into consideration the

7

intended purpose of the discovery order:  to prevent surprise and to permit appellant to prepare an adequate defense."  *Oprean II*, 238 S.W.3d at 415.

## 2.  Willful Violation of the Discovery Order

During a pre-trial hearing regarding, among other things, the logistics of providing trial exhibits, the trial court ruled that if either expert "print[ed] something out of [the CD] that [he] intend[ed] to use at trial, then [counsel] need[ed] to show it to [o]pposing [c]ounsel and get his or her initials on that exhibit at least . . . 7 days before trial.  Unless that's going to be a problem."  The State argued in favor of the order, expressing a concern that the defense, during its case-in-chief, might produce exhibits that contained manipulated information such as printed changes in the format of a CD.  The trial court indicated that it did not "want any surprises by either side or attorneys from either side claiming that they're surprised that they hadn't been shown those exhibits that [were] being tendered." It did not "want to have to deal with the issue of surprise by either side as to exhibits that [were] going to be used by the experts."  Defense then suggested that if the exhibits came in after that seven-day deadline, counsel would approach the court for a ruling, because it would be likely that it would not be a surprise.  In response, the trial court commented that it "may be inclined to deny the admission of any exhibits . . . unless there's a good cause."  Before jury selection, the trial court again ordered that "[counsel] meet and exchange any exhibits that [they] plan[ned] to offer so that nobody w[ould] be surprised."

At trial, exact duplicates of the child's electronic radiology records, including films and radiology reports, were admitted as State exhibits 59A-61C through the testimony of Carlos Pena, assistant director of the radiology department at McAllen Medical Center.  In addition, the child's digital radiology records, produced as CDs, were admitted as State

8

Exhibit 65 and described as "CT scan." A companion exhibit, labeled State Exhibit 64, was also admitted. This exhibit was described as "System pack [or PACS] download."[8] Omar Cantu, the storekeeper of digital imaging for the medical facility, testified that no alterations or changes had been made to the child's records when they were transferred from the mainframe system at the medical center to the CDs.[9] These exhibits were admitted without objection.

On the day Dr. Lukefahr was called to testify, the State provided Gonzalez with eight additional exhibits prepared by Dr. Lukefahr from the child's radiology records.[10] In preparing these materials, Dr. Lukefahr enlarged some record images, changed the brightness or contrast levels of others, and added descriptive words or arrows to some images. It is undisputed that the State did not provide these newly prepared materials to Gonzalez prior to trial as required by the trial court's pretrial discovery order.

At a hearing on this matter, the prosecutor explained that she had not provided the new exhibits to Gonzalez earlier because Dr. Lukefahr had prepared them the night before he was to testify and had given them to her that morning. While recognizing that at least

---

[8]Neither party disputes that the CDs containing images of the January 2, 2006 CT scan were admitted into evidence. Two CDs are included in the record. They are labeled only by the trial cause number and style, and we are unable to determine their content. However, because no specific issues are raised regarding the images on the CDs, we decline to address this matter further. *See* TEX. R. APP. P. 47.1. We also note that other exhibits admitted at trial are not included in the reporter's record filed with this Court or are grouped together, for example, as "photos." Because neither party complains of missing or mislabeled exhibits, we conclude that the record is complete, as acknowledged by the actions of the parties, and any missing or mislabeled exhibits are not necessary to the resolution of this appeal. *See id*. at R. 34.6(f).

[9]The evidence reveals that both Gonzalez and the State had access to the CDs, as well as to the filing system. There were also discussions on the record showing that both sides were aware of the complexity of opening the records, reviewing them, and producing copies of the images from the records.

[10]These new materials were later admitted as State exhibits 98a, 99, 100a, 101a, 102a, 103a, 104a, and 105a, These same exhibits appear to be described in the index of the reporter's record as printouts of exhibits 98, 102, 103, 104, and 105 and are referred to as such in the record.

9

one of the exhibits had been manipulated in some fashion and others had arrows or words added, the prosecutor also advised the trial court that the images from which Dr. Lukefahr prepared the new exhibits had been previously admitted. The record also establishes that, prior to trial, defense counsel had the radiology records or had access to the records, as did Gonzalez's medical expert.

Gonzalez's objection of "utter surprise" was overruled. Gonzalez then "request[ed] a continuance [of at least a week] to allow an opportunity to have [his] expert . . . review this material." *Cf. Lindley v. State*, 635 S.W.2d 541, 544 (Tex. Crim. App. 1982) ("The failure to request a postponement or seek a continuance waives any error urged in an appeal on the basis of surprise."). The trial court denied the request and also denied Gonzalez's motion for mistrial.

Nothing in the record indicates that the prosecutor knew the complained-of exhibits existed and that she willfully concealed the exhibits from defense counsel until trial was underway. The State brought the exhibits to the attention of defense counsel the morning they were received. Although Gonzalez argues that the prosecutor must have known that the exhibits were forthcoming, except for the prosecutor's comment at the pretrial hearing that potential manipulation of the records was a concern of hers, there is nothing in the record to support this contention. The prosecutor informed the trial court that defense counsel had knowledge of the substance of the exhibits because the radiology records had been admitted as trial exhibits, without objection. The State also disclosed the radiology records to Gonzalez prior to trial, pursuant to the discovery order, and the new exhibits were portions of those previously-produced records.

10

Based on the above, we conclude that the prosecutor did not act willfully. The prosecutor's actions were not consistent with an intent to harm the defense, with a strategic and purposeful effort to thwart the defense's preparation of its case, or with a specific purpose or conscious decision to disobey the court's discovery order. *See Oprean*, 201 S.W.3d at 727-28. The prosecutor's explanation for violating the discovery order was valid; the prosecutor received the new exhibits—produced from exhibits that had already been admitted at trial and reviewed by Gonzalez's expert—at a time such that compliance with the terms of the discovery order was impossible. *See id.* The trial court's implicit finding that the prosecutor did not willfully withhold the exhibits is supported by the record, and thus, the trial court did not abuse its discretion in overruling Gonzalez's objection and admitting the exhibits. *See id.* at 726.

### 3. Harm

Even if the trial court erroneously admitted the complained-of exhibits, Gonzalez must show harm based on surprise or on his inability to prepare an adequate defense because of the State's discovery order violation. *See Cooks*, 844 S.W.2d at 734 n.31; *Oprean II*, 238 S.W.3d at 415. We conclude that he has not.

### a. Surprise

Gonzalez asserts that he was harmed because he was surprised. However, prior to trial, the State disclosed the child's radiology records, and Gonzalez's expert had access to those records. The records were also admitted into evidence at trial, without objection, on May 10, 2006, and Dr. Lukefahr did not began testifying until May 16, 2006. Therefore,

11

defense counsel had knowledge of the substance of the exhibits through the earlier-produced records.

Furthermore, Dr. Lukefahr discussed each newly produced exhibit in conjunction with the electronic or digital image from which it was taken. For example, Dr. Lukefahr explained that he had changed the brightness and contrast on one exhibit to make the fracture lines more visible. He testified that he added arrows to other images for quick reference in order to illustrate particular aspects of the exhibit. Throughout his testimony, Dr. Lukefahr emphasized certain portions of the earlier-admitted records to illustrate the basis for his conclusion that the child had died from Shaken Baby Syndrome. We cannot conclude that the prosecutor's actions unfairly surprised Gonzalez.

### b. Opportunity to Prepare a Proper Defense

Gonzalez also argues that he was harmed by the State's violation of the discovery order because he was not permitted to prepare a proper defense. Also, citing to the concurrence in *Oprean*, Gonzalez complains that his due process right to adequate notice was denied because "[t]he images were sprung approximately nine days into the trial in the State's case-in-chief. When ruled admissible, defense counsel's attempts for some form of postponement to prepare were denied." *See Oprean*, 201 S.W.3d at 729 (Cochran, J., concurring).

However, after the State concluded its examination of Dr. Lukefahr, the trial court recessed for lunch providing time for Gonzalez to review the exhibits in preparation of his cross-examination of the doctor. When the afternoon session began, Gonzalez asked Dr. Lukefahr questions regarding "certain images that [he] personally found significant in this case," including the printouts of State exhibits 98 (skull image printout), 101 (rib x-ray

12

printout), and 102 (rib x-ray printout)—images Dr. Lukefahr used during the State's direct examination.

Importantly, Dr. Lukefahr's testimony concluded on May 16, 2007, and Dr. Rose was not called to testify until May 22, 2007, six days later. Before testifying, Dr. Rose reviewed the child's medical records, including reports, films, and CDs. He also reviewed the exhibits used by Dr. Lukefahr, as well as the transcript of Dr. Lukefahr's testimony related to those exhibits, and offered his opinion on both at trial. Defense counsel utilized some of the complained-of exhibits during the examination of his expert. And, through his testimony, Dr. Rose compared the medical records with Dr. Lukefahr's testimony, highlighted discrepancies and weaknesses, and provided his interpretation of images prepared by Dr. Lukefahr. Finally, Dr. Rose discussed images he himself had printed from the CDs, noting that each contained the following caution: "WARNING! THE QUALITY OF THIS IMAGE PRINTOUT MAY NOT BE ADEQUATE. IT SHOULD THEREFORE NOT BE USED FOR DIAGNOSTIC PURPOSES." Dr. Rose testified that the warning was necessary because a printed image may have "some artifact [from the printer], . . . some distortion . . . [that] is just not there" on the image. Based on this printed warning and Dr. Rose's testimony, Gonzalez was able to raise some inferences at trial regarding the validity of exhibits printed from the electronic and digital radiology reports and used by Dr. Lukefahr to support his conclusions.

In summary, the trial court recessed for lunch after the State finished its direct examination of Dr. Lukefahr. This recess provided defense counsel an opportunity to view the newly produced images and to prepare a defensive strategy before he cross-examined Dr. Lukefahr. After lunch, the defense questioned Dr. Lukefahr about the new exhibits.

Six days later, Dr. Rose testified. Dr. Rose's testimony addressed concerns the defense had about Dr. Lukefahr's exhibits and the conclusions they supported. It is apparent that Gonzalez had the opportunity to prepare an adequate defense. *See Oprean II*, 238 S.W.3d at 415.

Gonzalez's concerns about his due process right to adequate notice are also unfounded. *See Oprean*, 201 S.W.3d at 729 (Cochran, J., concurring). Here, although the trial court immediately denied Gonzalez's motion to continue the trial, during the lunch recess Gonzalez had an opportunity to review the exhibits and prepare his defense. This recess, coupled with the fact that Dr. Rose did not testify until six days later, protected Gonzalez's due process right to adequate notice. *See id*.

We conclude that Gonzalez was not surprised and was permitted to prepare an adequate defense. Thus, the intended purpose of the discovery order was satisfied, *see Oprean II*, 238 S.W.3d at 415, and his due process rights were satisfied. *See Oprean*, 201 S.W.3d at 729 (Cochran, J., concurring). Gonzalez was, therefore, not harmed by the State's failure, if any, to disclose the exhibits. *See Cooks*, 844 S.W.2d at 734 n.32.

Accordingly, we overrule Gonzalez's first issue.

### B. Prosecutor's Statement Regarding Paramedics Testifying

By his second issue, Gonzalez argues that the trial court erred in denying his request for a mistrial. Gonzalez contends that while the prosecutor's comment may have been an attempt to discredit one of the State's exhibits, it instead impermissibly shifted the burden of proof to Gonzalez to prove his defensive theory.[11] We disagree.

---

[11]The State responds that its comment was proper because "the State is allowed to comment on a defendant's failure to produce testimony from sources other than himself or herself." The State's argument on appeal is premised on a line of cases that address whether a statement is an improper comment on a

14

### 1. Standard of Review and Applicable Law

> An appellate court reviews a trial court's ruling on a motion for mistrial . . . using an abuse-of-discretion standard of review. We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement. We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. Thus, a trial court abuses its discretion in denying a motion [for mistrial] only when no reasonable view of the record could support the trial court's ruling.

*Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).

The State has the burden to prove the elements of the offense beyond a reasonable doubt. *See* TEX. PENAL CODE ANN. § 2.01 (Vernon 2003) ("All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt."). And, "[t]he defendant in a criminal trial should be allowed to argue any defensive theory supported by the evidence admitted at trial." *Arnold v. State*, 68 S.W.3d 93, 102 (Tex. App.–Dallas 2001, pet. ref'd) (citing *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997) (en banc) (discussing jury instructions available on affirmative defenses)). However, when a defendant raises a defensive theory, the State's burden of proof does not change; the defensive theory merely casts doubt upon whether the State has met its burden. *See Walters v. State*, 247 S.W.3d 204, 209-10 (Tex. Crim. App. 2007) (discussing the burden of proof with regard to an alibi and concluding that a special instruction on this defensive theory would constitute an unwarranted comment on the weight of the evidence). In other words, although the State

---

defendant's failure to testify. *See Jackson v. State*, 17 S.W.3d 664, 674 (Tex. Crim. App. 2000); *Patrick v. State*, 906 S.W.2d 481, 491 (Tex. Crim. App. 1995) (en banc); *Livingston v. State*, 739 S.W.2d 311, 338 (Tex. Crim. App. 1987); *Caron v. State*, 162 S.W.3d 614, 618 (Tex. App.–Houston [14th Dist.] 2005, no pet.). However, Gonzalez does not contend that the State's remark was a comment on his failure to testify; instead, he argues that the State's comment improperly shifted the burden of proof to him. Accordingly, we focus our analysis on whether the State attempted to shift its burden to Gonzalez.

has no burden of production of evidence on a defensive issue, once a defense is raised the State has the burden to persuade the jury with respect to that issue. *Allen v. State*, 253 S.W.3d 260, 267 n.24 (Tex. Crim. App. 2008).

Also, error in admitting improper evidence, or, in this case, an improper comment, is generally cured by an instruction to disregard, with the only exception to this rule being extreme cases where it appears that the comment was clearly calculated to inflame the minds of the jurors and is of such a character as to suggest the impossibility of withdrawing the impression produced on their minds. *See Thrift v. State*, 176 S.W.3d 221, 224, n.10 (Tex. Crim. App. 2005). It is also presumed that jurors follow judicial instruction. *See id*.

### 2. Shifting of Burden

Gonzalez cross-examined Dr. Turlapati about State's Exhibit 67, a Med-Care Ambulance report, when the following exchange occurred:

Q.      This is State's Exhibit No. 67. This is a Med-Care report, Med-Care Ambulance. . . . Would you agree with that?

A.      Yes, I do.

        . . . .

Q.      [W]hen the Med-Care Ambulance arrived, the chief complaint was cardiac arrest and the child had not been breathing for 15 minutes?

A.      Yes.

Q.      And at that time they indicate here: Patient in cardiac arrest?

A.      Yes.

        . . . .

Q.      [On page 2 at the very bottom], we again have the front and back view of the body?

16

A. Yes.

Q. And there's no indication on either of those of any sort of physical injury?

A. Yes.

Q. Yes, there is not?

A. There is no indication.

. . . .

Q. Now Doctor, let[']s go back to the same exhibit. Patient not breathing for 15 minutes. But let's go up here to the top, incident date, January 1st. Time arrived on the scene. You see that, 1350?

A. Yes.

Q. That's 1:50 P[.]M[.]?

A. Yes.

Q. So at 1:50 P[.]M[.] we know the child had no physical markings on his body. We know the child—

[The State]: I will object to the—I will object to the mischaracterization of the evidence. There is no indication on the record—this doesn't necessarily mean there are no physical markings. There is a different—

The Court: Sustained.

[The State]: If he wants to call in the paramedics to say that, fine.

[Defense]: I will object to the State shifting the burden of proof in front of the jury. I ask that the—

The Court: Sustained.

[Defense]: I ask that the jury disregard the last comment.

17

The Court:     Jury is instructed to disregard the last comment made.

[Defense]:     While I appreciate the court's instruction, we would ask for a mistrial.

The Court:     Denied.

According to Gonzalez, part of his defense was that the child had no external injuries when the paramedics attempted to care for him and that the injuries noted later resulted from efforts to revive him. Gonzalez claims that he cited to the State's own exhibit as proof that the child's injuries were not obtained until after he was taken into medical care.

Here, Gonzalez's defensive theory concerning when the child's injuries occurred involved an element of the offense—that he intentionally and knowingly caused the child's death. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1) (Vernon 2003), 19.03(a)(8). The State had no burden of proof beyond its initial burden to prove the elements of the offense beyond a reasonable doubt, *see id*. § 2.01, and we cannot conclude that the prosecutor's comment was an attempt to shift that burden.

Gonzalez complains of only one comment about the defense's ability to present evidence and its failure to do so. The record reveals that, prior to making that comment, the State objected to defense counsel's characterization of the ambulance report as evidence that "the child had no physical markings on his body" as of 1:50 p.m. on January 1st. It is clear that the objection was made because Dr. Turlapati testified only that there was "no indication" in the report of "any sort of physical injury." The trial court sustained the State's objection. Immediately thereafter, the State commented that "[i]f [Gonzalez] wants to call in the paramedics to say [there were no physical markings], fine." The State

18

did not comment that Gonzalez had the burden to prove, through its defensive theory, that he did not intentionally and knowingly cause the child's death. The State merely pointed out that Gonzalez could clarify that matter by calling the paramedics. While Gonzalez could argue any defensive theory supported by the evidence admitted at trial, *see Arnold*, 68 S.W.3d at 102, the State had no burden to produce evidence on Gonzalez's defensive issue. *See Allen*, 253 S.W.3d at 267 n.24. The State only had the burden to persuade the jury with respect to that issue. *See id*. Thus, we conclude that the prosecutor's comment did not shift any burden of proof in this case.

Nonetheless, even were we to conclude otherwise, the trial court sustained Gonzalez's objection, granted his request for an instruction to disregard, and did, in fact, instruct the jury to disregard the prosecutor's remark before it denied Gonzalez's request for a mistrial. Based on our review, the prosecutor's remark, even if deemed error, was not so inflammatory that its impression could not be withdrawn by the trial court's instruction to disregard. *See Thrift*, 176 S.W.3d at 224, n.10. Presuming that the jurors in this case followed the trial court's instruction to disregard, we conclude that the instruction was sufficient to cure error, if any, caused by the challenged comment. *See id.*

Therefore, viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the trial court's denial of Gonzalez's motion for mistrial was within the zone of reasonable disagreement. *See Webb*, 232 S.W.3d at 112. The trial court's decision was neither arbitrary nor unreasonable and was, therefore, not an abuse of discretion. *See id*. Accordingly, we overrule Gonzalez's second issue.

19

### III. CONCLUSION

The judgment of the trial court is affirmed.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 21st
day of October, 2010.

20